**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert MARTINEZ,
Defendant–Appellant.**

**No. 87–1094.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 4, 1988.

Decided Aug. 23, 1989.

---

James D. Comack, Honolulu, Hawaii, for defendant-appellant.

John F. Peyton, Jr., Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.

Before WALLACE, REINHARDT and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Robert ("Bobby") Martinez was convicted on four counts of importing heroin into the United States in violation of 21 U.S.C. § 960(a)(1) and one count of possession with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(i). He appeals from denial of his motion for a new trial. The appeal involves a question of constitutional law new in this circuit: what constitutes an effective waiver by a criminal defendant of his fundamental personal right to testify in his own behalf.

## FACTS

The evidence presented by the government established that in September and October 1986 United States Customs in Hawaii intercepted four packages identically wrapped and addressed in the same handwriting, with the same misspelled word, mailed from Changmai, Thailand. Each package contained a carved wooden elephant. Each elephant was packed with heroin. The four packages were addressed to four different people at three different addresses. The persons at the different address did not know each other. Their only tie was a common acquaintance with Bobby Martinez. None of the addressees had ordered or expected to receive wooden elephants.

A controlled delivery was made of the elephant addressed to Martinez's aunt Flora and her husband. After the delivery the house was kept under surveillance for nine days. At the end of this period a car was observed leaving the house. A federal agent went to the front door and saw that the elephant was missing. The agents followed the car. A wild chase through Honolulu ensued. The car was finally stopped and its driver, Martinez, was apprehended with the elephant in his possession.

At the trial Martinez was represented by Michael A. Weight, a native of Hawaii educated at the University of Rochester and at Vanderbilt University Law School, from which he graduated in 1967. From 1969 to 1974 he was Deputy Prosecuting Attorney in Honolulu and in 1976 he was Special Assistant Attorney General. He is a member of the state bar and of the bars of the district court in Hawaii, the Ninth Circuit, and the Supreme Court of the United States. Weight was privately retained by Martinez. The focus of this appeal is Weight's refusal to call Martinez as a witness in his own behalf.

After being retained, Martinez told Weight that he wished to testify in his own defense. Weight told him that under the circumstances he was not prepared to say whether that was advisable or not. In Weight's view it depended on whom the government called as prosecution witnesses.

The trial began with uncertainty continuing as to who would testify for the government. Until the government's case was in, Weight told Martinez a decision could not be made as to whether he should testify or not. At the end of the government's case Martinez told Weight "that he felt he should testify." Weight told Martinez that he was not going to call him. As Weight recalled the conversation, "He expressed to me the desire to testify; and I said no way, that I thought it was suicidal for him to testify and it would be an error in judgment; and that was it. I just made the decision he was not going to testify, I refused to call him, and that was the way it went down."

Weight did not come right out and say, "If you take the witness stand I am going to withdraw from the case." However, in Weight's view, "implicit in what I told him was that implied threat, I suppose."

The decision not to call Martinez was not based on the belief on Weight's part that Martinez would have perjured himself on the stand. Martinez wanted to offer exculpatory testimony that would have contradicted other testimony but in Weight's view did not constitute perjury. Weight did not discuss with Martinez the option of Martinez approaching the trial judge and saying that he was having a problem taking the stand because Weight was holding him back. In Weight's opinion, Weight had made "the strategic and tactical decision that he should not testify, notwithstanding his request to do so."

At no point did Martinez say he "demanded to testify" or "insisted on testifying." According to Weight, "he never said he did not care what I felt about it." As Weight summarized the matter after considerable interrogation as to what had gone on: "If we keep it pure and simple the way it went down, the way it went down was Bobby says: 'I want to testify'; I said 'No, you're not going to testify'; period, end of conversation."

## PROCEEDINGS

After Martinez was convicted and sentenced he obtained new counsel and moved for a new trial on the ground that "he was deprived of his fundamental constitutional right to testify at the initial trial herein due to the unilateral decision of his counsel not to call him as a witness." The district judge denied the motion. Martinez appeals.

## ANALYSIS

### 1.

The leading case on the issue presented here is *Wright v. Estelle*, 572 F.2d 1071 (5th Cir.) (en banc), *cert. denied* 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978). A majority of the court in that case took the position that counsel's overriding of his

client's desire to testify could be harmless error and in fact in the case before it was harmless error. The district court in this case ruled that even if there was a right to testify that could not be waived the error was harmless. The evidence pointing to conviction, the court ruled, was overwhelming and the exculpatory evidence to which the defendant would have testified would have had little or no value: "[F]or one thing if he denies it [the evidence against him] it would be self-serving."

Because there has been such a change in fairly recent times in willingness to accept the testimony of an accused, history gives us less light than it sometimes affords. To invoke Socrates, as Judge Godbold did dissenting in *Estelle*, 572 F.2d at 1078, is to go back to a real person whose words, as we have them, were penned by his pious pupil, Plato. We have no first hand knowledge of what he said. To approach a little closer to our own system, English law did not give evidentiary weight to a defendant's testimony. In the famous 1535 trial of Thomas More, he, as a lawyer, was able to argue evidentiary points with the witnesses against him and to insist on the custom of being allowed to address the court after the jury had brought in a verdict, but before sentence had been pronounced. *The Trial of Sir Thomas More*, 1 Howell's State Trials 392 (1816). If the defendant was not a lawyer, this procedure did not offer him much of an opportunity to argue and address the court and certainly no opportunity to offer his own testimony. *See, e.g., The Trial of Sir Walter Raleigh*, 2 Howell's State Trials 1–60 (1816). Raleigh did wrangle, unsuccessfully, on points of law with his judges in 1603. *E.g., id.* at 4, 19 and 24. But the defendant was denied the opportunity to confront his principal accuser, *id.*, and was subjected to vicious vituperation by the attorney general, Edward Coke. *Id.* at 7–8, 25–27. A reading of the transcript conveys the impression that the trial was a show trial in the sense of Soviet trials for treason in the 1930s and that the defendant was permitted to participate, not in recognition of his dignity, but to be made an exhibition.

If we approach a little closer to our system and look at the practice of a founding father who was also a leading lawyer, John Adams considered it a natural right for a person to have the advice of counsel in a capital case. 3 *Legal Papers of John Adams* 7, (L. Wroth & E. Zobel ed. 1965). But Adams in no uncertain terms set out to his clients what the clients could expect of him, if we may trust his recollection of what happened in his defense of Captain Preston in the Boston Massacre Case. Adams responded to James Forrest, otherwise known as the Irish Infant, an agent of Captain Preston, as follows:

> I had no hesitation in answering that Council ought to be the very last thing that an accused Person should want in a free Country. That the Bar ought in my opinion to be independent and impartial at all Times And in every Circumstance. And that Persons whose Lives were at Stake ought to have the Council they preferred: But he must be sensible this would be as important a Cause as ever was tryed in any Court or Country of the World: and that every Lawyer must hold himself responsible not only to his Country, but to the highest and most infallible of all Trybunals for the Part he should Act. He must therefore expect from me no Art or Address, No Sophistry or Prevarication in such a Cause; nor any thing more than Fact, Evidence and Law would justify.

*Id.* at 6.

Judge Godbold in his dissent in *Estelle* asserted that we know, at least, that the founding fathers were in favor of free choice. *Estelle*, 572 F.2d at 1078, *quoting Faretta v. California*, 422 U.S. 806, 833–34, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562 (1975). In an abstract sense of course this observation is true, but if we look at Adams speaking to the Irish Infant, it is apparent that Adams thought a great many choices would be made by counsel. On probably the single most critical issue in the case, whether the soldiers who had done the shooting would be tried along with Captain Preston, their commanding officer, Adams made the decision for a joint trial, even though that choice offered

the probability of severe prejudice to the soldiers. It was necessary for three of them, Private Matthew Kilroy and his fellows, to object to the court. 3 *Legal Papers of John Adams* at 17. Adams' conduct with Kilroy would not meet modern standards of professional behavior but does afford light on what was considered appropriate by a good lawyer at the time of the Revolution.

The Constitution of Massachusetts, adopted in 1780, reflects Adams' approach: "[E]very subject shall have a right to ... be fully heard in his defence by himself, or his counsel, at his election." *Id.* Part 1, Art. XII. The choice offered is between being one's own lawyer or having counsel.

One of the first acts of Congress, The Judiciary Act of 1789, provided: "[I]n all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel or attorneys at law as by the rules of the said court respectively shall be permitted to manage and conduct causes therein." 1 Stat. 73, 92 § 35 (1789). Again, as in the Constitution of Massachusetts, a choice is set up between managing one's own case personally or doing so by the assistance of counsel who are permitted "to manage and conduct causes."

The Sixth Amendment was proposed in the same Congress that adopted the Judiciary Act. On June 8, 1789 Madison proposed in the House without explanation what became the amendment, 1 *Annals of Congress* 451 (J. Gales ed. 1789). The "assistance of counsel" clause was returned by the Senate, unaltered, on September 21, 1789. *Id.* at 948. On September 24, 1789 the Judiciary Act became law. 1 Stat. 73, 93 (1789). The scant discussion that attended the amendment in Congress and in the states ratifying the amendment offers no light on its meaning in regard to the present question. *See* W. Beaney, *The Right to Counsel in American Courts* 27–28 (1972). It is clear, however, that the First Congress believed that there was a right to manage one's own defense personally although not necessarily a right to do that and also have the management of the

case conducted by counsel. The structure of the amendment calls for a choice.

### 2.

The right to testify in one's own behalf is a right that has been found by the Supreme Court to derive from several sources in the Constitution. It is one of the rights "essential to due process of law in a fair adversary process." *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987), *quoting Faretta,* 422 U.S. at 819 n. 15, 95 S.Ct. at 2533 n. 15. The right "is also found in the Compulsory Process Clause of the Sixth Amendment." *Id.* 107 S.Ct. at 2710. It is also "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* It has been authoritatively determined that it is unconstitutional for the state to restrict this right by a rule precluding post-hypnosis testimony by a defendant. *Id.* at 2714–15.

At the same time it has been recognized that the constitutional right to testify is not so absolute that it may not be subjected by the state to reasonable restrictions. For example, the right to testify carries with it the obligation to submit to cross-examination. *United States v. Hearst,* 563 F.2d 1331, 1340 (9th Cir.1977). The defendant is faced with the decision of whether he should preserve his constitutional right to complete silence or put on what may be his only defense and thereby open himself to cross-examination. *United States v. Wagner,* 834 F.2d 1474, 1483 (9th Cir.1987).

The rule is that "restrictions of a defendant's right to testify may not be arbitrarily disproportionate to the purposes they are designed to serve." *Rock,* 107 S.Ct. at 2711. A proportionate reason is the obligation of a lawyer not to present a perjurious witness to the court. *See Nix v. Whiteside,* 475 U.S. 157, 168–70, 106 S.Ct. 988, 994–95, 89 L.Ed.2d 123 (1986); *United States v. Curtis,* 742 F.2d 1070, 1076 (7th Cir.1984). It is in terms of the guiding principle of the proportion of the restriction to the purpose served that we evaluate Martinez's claim to a new trial because his testimony was prevented, not by the state

but by his own lawyer. *See Rock*, 107 S.Ct. at 2711.

The decision whether or not to exercise the right to testify is to be made by the accused after consultation with counsel. American Bar Association, Report on Standards Relating to the Prosecution Function and the Defense Function §§ 5.2, 237–38 (1971); American Bar Association, Model Rules of Professional Conduct Rule 1.2(a) (1983). The earlier rules of the American Bar Association, Model Code of Professional Conduct, EC 7–7 were not explicit but did provide that the authority to make decisions affecting the merits of the case or substantially prejudicing the rights of a client were "exclusively that of the client." These provisions were in force in Hawaii, *see Code of Professional Responsibility of the State of Hawaii* (1981).

As to the case where a lawyer has made a strategic decision not to put his client on the stand we have guidance from *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Counsel for a defendant found guilty of murder made the strategic decision not to put the defendant on the stand in the sentencing hearings. The lawyer's meetings with his client and the testimony of a psychologist had convinced the lawyer "that it would be unwise to put petitioner himself on the witness stand." *Id.* 107 S.Ct. at 3124. This strategic decision was found to be a reasonable one and did not amount to ineffective representation by the lawyer. The Court said, "Quite obviously, as the District Court concluded, an experienced trial lawyer could properly have decided not to put either petitioner or the psychologist who had thus evaluated him in a position where he would be subject to cross-examination that might be literally fatal." *Id.*

A sentencing hearing is not identical to a trial, but "a capital sentencing proceeding 'is sufficiently like a trial in its adversarial format and in the existence of standards for decision' that counsel's role in the two proceedings is comparable." *Id.* at 3123, *quoting Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). If it was not ineffec-tive assistance of counsel for a lawyer to make a strategic decision not to put the defendant on the stand in a capital sentencing proceeding, it was not ineffective assistance not to put the defendant on the stand in an ordinary criminal trial.

In our case Michael Weight made a strategic decision not to put Bobby Martinez on the stand. He knew that Martinez had been convicted less than three years before of using a communications facility to further the distribution of cocaine in violation of 21 U.S.C. § 842(b). Indeed he had represented Martinez in that case. He also knew that Martinez's aunt would contradict a substantial part of his testimony. He also was informed that if Martinez testified the government would call as a rebuttal witness one Paul Cleveland who would testify that he was incarcerated in a federal prison and there came to know Martinez and that they both then met a Thai national who informed them that when he returned to Thailand he would be available to help them in heroin trafficking and that after his release from prison he, Cleveland, had made arrangements with the Thai national to engage in this traffic with himself and Martinez. Weight formed the opinion that Cleveland's testimony would be "very damaging to Martinez." He avoided Cleveland's testimony by not putting Martinez on the stand. If Martinez's claim now was that he had been rendered ineffective assistance of counsel, Weight's conduct would be found to have been reasonable. *See Burger v. Kemp*, 107 S.Ct. at 3122–23.

The district judge explicitly found that Weight was one of the most competent lawyers practicing before it. Weight's strategic decision was not of such a character as to make him less than Martinez's lawyer when he made it.

3.

The possibility remains, however, that the right to testify may have been violated although the right to counsel was not. The argument is as follows: The right to defend one's self is fundamental. It is a right older and more basic than the right to counsel. It is a personal right absolutely

necessary to assure the treatment of the defendant as a human person when threatened with the loss of life or liberty or property by the state. The Sixth Amendment is the embodiment in our Constitution of this natural right. *See Faretta*, 422 U.S. at 812–21, 95 S.Ct. at 2529–34. The Sixth Amendment "grants to the accused personally the right to make his defense." *Id.* at 819, 95 S.Ct. at 2533.

■ The Sixth Amendment guarantees *the assistance* of counsel. It is predicated on the assumption that the client is the master of his or her case. Accordingly in *Faretta* it was held that the state could not foist counsel upon the accused. The amendment's structure "necessarily implied" the right to self-representation. *Id.* at 819, 95 S.Ct. at 2533. The right to defend oneself was "given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 820, 95 S.Ct. at 2533. The right to testify is a constitutional right of fundamental dimensions.

The fundamental and personal character of the right has been eloquently set out by Judge Godbold in *Wright v. Estelle*, 572 F.2d 1070, 1077–80 (5th Cir.1978) (en banc) (Godbold, J., dissenting). Its fundamental and personal character has also been recognized in dicta in opinions of the Supreme Court. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 2509–10, n. 1, 53 L.Ed.2d 594 (1977) (concurring opinion). In this case we treat the right as fundamental and personal.

■ As the right is fundamental and personal it can only be relinquished by the person to whom it belongs, the defendant in a criminal trial. The general rule is clear that the relinquishment of such a right must be intentional and to be intentional must be known to the one who gives it up. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

This general rule has been applied where a defendant has been induced to waive jury trial and plead guilty. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (waiver of jury trial); *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1968) (guilty plea). This general rule has been applied where a defendant has also been alleged to waive counsel. In such a case it has been held that the record must show that the accused was offered counsel but intelligently and understandingly rejected the offer. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1968); *Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962). A waiver of counsel cannot be presumed from a silent record. *Boykin*, 395 U.S. at 242, 89 S.Ct. at 1711–12, *quoting Carnley*, 369 U.S. at 516, 82 S.Ct. at 890.

Here it is argued that Bobby Martinez did not intentionally relinquish his right to testify. In the face of Weight's peremptory refusal to put him on the stand he continued to ask to testify, so he relinquished nothing. Moreover, as he never phrased his request in terms of the Constitution it is not evident that he knew he had the right to testify and he could not have intentionally abandoned a right he did not know he had. On both grounds, therefore, it is urged that there was here no waiver of a known constitutional right. Its waiver cannot be presumed from the silent record.

■ Custom and common sense, however, have led to a different conclusion in cases analogous to the instant one. The right not to testify is among the fundamental and personal rights recognized by the Constitution, *see Griffin v. California*, 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). If anything, one would expect the right not to testify to be more zealously guarded than the right to testify. An uninformed defendant probably expects to testify and may be unaware how strongly the Constitution protects his right not to testify. Yet the trial court has no duty to make a sua sponte inquiry to advise the defendant of his right not to testify and to ensure that its waiver was knowing and intelligent. Rather, the defendant by taking the stand waives this significant right even though the record gives no explicit

assurance that this waiver was knowing and intelligent. *Wagner,* 834 F.2d at 1483.

■ The court has no obligation to inquire into whether the defendant knowingly and intelligently waived the right not to testify inherent in the privilege against compelled self-incrimination. *Id.* It is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify, and the tactical advantages and disadvantages of each choice. For the court to discuss the choice with the defendant would intrude into the attorney-client relationship protected by the sixth amendment. *Id., citing United States v. Goodwin,* 770 F.2d 631, 637 (7th Cir.1985).

Every case of which we are aware has reached this same conclusion. *See, e.g., Knowles v. State,* 364 So.2d 712, 713–14 (Ala.Cr.App.1978); *People v. Vargas,* 195 Cal.App.3d 1385, 241 Cal.Rptr. 360 (1987); *People v. Longwith,* 125 Cal.App.3d 400, 178 Cal.Rptr. 136 (1981); *People v. Thomas,* 43 Cal.App.3d 862, 866–68, 118 Cal. Rptr. 226 (1974); *People v. Mozee,* 723 P.2d 117 (Colo.1986); *State v. LoSacco,* 12 Conn. App. 481, 531 A.2d 184, 187 (1987); *State v. McKenzie,* 17 Md.App. 563, 303 A.2d 406 (Md.Spec.App.1973); *Martin v. State,* 73 Md.App. 597, 535 A.2d 951, 952–53 (Md. App.1988) (collecting cases); *People v. Johnson,* 168 Mich.App. 581, 425 N.W.2d 187, 189 (1988); *State v. Bogus,* 223 N.J.Super. 409, 538 A.2d 1278, 1287–88 (1988) (collecting cases); *State v. Poindexter,* 69 N.C.App. 691, 318 S.E.2d 329, *cert. denied,* 312 N.C. 497, 322 S.E.2d 563 (1984).

The most frequently given reason is that the decision is a matter of trial strategy between the defendant and counsel; the court should not interfere. *See, e.g., McKenzie,* 303 A.2d at 418; *Johnson,* 425 N.W.2d at 189; *Bogus,* 538 A.2d at 1286.

There is also a danger that the judge will appear to encourage the defendant to invoke or to waive this right. *See Commonwealth v. Waters,* 399 Mass. 708, 506 N.E.2d 859, 865 (1987); *Bogus,* 538 A.2d at 1286. This danger is of great significance because the right not to testify counterpoises the right to testify, and the exercise of one is the waiver of the other. *Waters,* 506 N.E.2d at 865.

Where a defendant foregoes his personal and fundamental right to represent himself and proceeds with counsel, it is not the norm for the record to show that by proceeding with counsel the defendant has knowingly and understandingly waived his right to represent himself. On the contrary, the presumption is made that when an accused proceeds with counsel he has elected to have counsel represent him. All courts reaching the question have uniformly and explicitly held that absent a request from the defendant a court has no duty sua sponte to advise him of his right to self-representation, nor any duty to ensure on the record that waiver of this right was knowing and intelligent. While no federal cases post-dating *Faretta* squarely address the issue, several pre-*Faretta* cases reach this conclusion. *E.g., United States v. Jones,* 514 F.2d 1331 (D.C.Cir.1975); *United States ex rel. Maldonado v. Denno,* 348 F.2d 12, 15–16 (2d Cir.1965); *see also United States ex rel. Soto v. United States,* 504 F.2d 1339 (3d Cir.1974) (rejecting constitutional right to proceed pro se, but holding that even if right is constitutional, no need for court sua sponte to advise defendant of right).

State courts have uniformly come to the same conclusion. *See, e.g., State v. Rickman,* 148 Ariz. 499, 715 P.2d 752, 756 (1986); *People v. Salazar,* 74 Cal.App.3d 875, 887–88, 141 Cal.Rptr. 753 (1977), *citing with approval, People v. Enciso,* 25 Cal. App.3d 49, 55–57, 101 Cal.Rptr. 590 (1972); *State v. Carter,* 200 Conn. 607, 513 A.2d 47, 50–51 (1986); *Torres–Arboledo v. State,* 524 So.2d 403 at 411 (Fla.1988); *Russell v. State,* 270 Ind. 55, 383 N.E.2d 309, 312–13 (1978); *State v. Stinson,* 424 A.2d 327 (Me. 1981); *State v. McCafferty,* 587 S.W.2d 611, 612 (Mo.App.1979); *People v. McIntyre,* 36 N.Y.2d 10, 18, 364 N.Y.S.2d 837, 844, 324 N.E.2d 322 (1974), *applied in People v. Burton,* 106 A.D.2d 652, 482 N.Y. S.2d 909, 910–11 (App.Div.1984); *Felts v. State,* 588 P.2d 572, 575–76 (Okla.Cr.1978); *State v. Garcia,* 92 Wash.2d 647, 600 P.2d 1010, 1014–15 (1979); *State v. Sheppard,*

310 S.E.2d 173, 187 (W.Va.1983); *Williams v. State*, 655 P.2d 273, 274–76 (Wyo.1982).

Among the reasons given are that (1) the exercise of the right of self-representation is actually to the detriment of the defendant as well as to the orderly administration of justice (as could also be said of the right to testify); (2) the right to self-representation is unlike the right to counsel, which itself protects other fundamental rights; (3) a defendant with counsel has not been denied a fair trial or his due process rights; (4) such advice from the court might suggest that the average defendant can represent himself or does not need the assistance of an attorney (as also could be said of the right to testify); and (5) unlike the right to counsel, this right is not a critical aspect of the right to a fair trial but rather is linked to the defendant's right to free choice (as also could be said of the right to testify).

The presumption of waiver inferred from conduct and a silent record has been decisively recognized in the special case of a pro se defendant: "Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984). The same rule has applicability where a defendant is not pro se but is represented throughout the proceedings by counsel. Any other rule would require the invalidation of an enormous number of federal and state criminal proceedings on the ground that the record did not show that the defendant had knowingly and intelligently waived his right to represent himself.

By extension, the same rule applies where a defendant fails to take the witness stand because of his counsel's advice. Adoption of the position taken by the dissent could require invalidation of a large number of federal and state trials on the ground that the silent record did not show that the defendant had been advised of his

constitutional right to testify and had voluntarily relinquished this right. According to the recent plurality in *Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a rule that imposes new obligations on the government may be applied retroactively to cases on collateral review if the new rule involves "new procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 1076–77. It is not clear whether or not the dissent believes that the right to testify is "so central to an accurate determination of innocence or guilt," *id.* at 1077, that retroactive application is justified. Even if, as the dissent ambiguously suggests, its proposed rule were prospective, it would have a serious impact on state prosecutions which could not be expected to adopt instantly the new rule of law. Common sense cries out against this conclusion.

The dissent's difficulty is in understanding how one can waive a personal and fundamental right by conduct. But the dissent accepts without batting an eye the common practice of inferring the waiver of the right to represent oneself from the conduct of the defendant appearing with counsel. *E.g. United States v. Weisz*, 718 F.2d 413, 425 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1027, 1034, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 668, 704 (1984); *cf. Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982) (en banc). In that practice there is no provision for ascertaining that the defendant knew he had the constitutional right to go it alone in court.

Another analogy exists in the defendant's right to confront the witnesses against him. This right is rooted in human nature, in ancient and long-standing legal practice, *Coy v. Iowa*, —— U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). It is expressly recognized by the Sixth Amendment. It has been characterized as a personal right. *Faretta v. California*, 422 U.S. 806, 819–20, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975); *see also Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir.1985). Indeed it has been paired with the right to testify in these terms: the defendant's "right to testify and to confront personally the witnesses against him." *Taylor v.*

*United States,* 414 U.S. 17, 19, 94 S.Ct. 194–95, 38 L.Ed.2d 174 (1973). A major component of this right is the right of the defendant "to cross-examine the witnesses against him." *Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065–69, 13 L.Ed.2d 923 (1965); *see also Coy v. Iowa,* —— U.S. ——, 108 S.Ct. 2798, 2802–03, 101 L.Ed.2d 857 (1988).

Day after day in the courts of the United States defense counsel make the decision not to cross-examine without first informing their clients that they have a fundamental constitutional right to insist upon cross-examination and without obtaining from their clients a formal written waiver of this constitutional right. How does a poor, uneducated, non-television-watching defendant know that he has a fundamental constitutional right that he is waiving when his lawyer declines to cross-examine? We assume, not unreasonably in our culture, that this right is so generally known that it is not necessary to inform the defendant of its existence. We also assume that by accepting counsel and not objecting in court to counsel's action that the defendant waives this right when counsel waives it. It is crystal-clear that a defendant may waive the right by his conduct. *United States v. Goldstein,* 532 F.2d 1305, 1314–15 (9th Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976). There is no requirement that the defendant be expressly advised of the right by the trial court. *Taylor,* 414 U.S. at 19, 94 S.Ct. at 195. There is no requirement that the defendant exerts a formal waiver of this right. Conduct alone—without proof of the defendant's knowledge or formal intent to waive—suffices. *Id.*

So, too, this circuit has already established that a criminal defendant's right to testify may be waived by conduct. *United States v. Ives,* 504 F.2d 935, 941 (9th Cir. 1974) (per Wallace, J.), *vacated,* 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *reinstated in part, vacated and remanded in part,* 547 F.2d 1100 (9th Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977). No inquiry was then held to be necessary to demonstrate that the defendant knew he was waiving a constitutional right, and the waiver was inferred to take place from conduct not addressed to the right. The court observed that it might infringe upon the privilege against self-incrimination for the prosecutor or court to inquire if the defendant wanted to testify. *Id.* at 940.

The rationale of *Ives* was recently adopted by the First Circuit, declining to invalidate a state criminal trial because the judge did not ascertain whether or not the defendant knew he had a right to testify and did not ascertain whether or not the defendant wished to exercise that right. *Siciliano v. Vose,* 834 F.2d 29, 30–31 (1st Cir.1987).

The argument based on danger to the privilege against self-incrimination does have a ready answer: the court could inquire of the defendant out of the presence of the jury. The defendant would not be prejudiced with the court, which is well aware of the defendant's right not to testify; the jury would never hear the inquiry; there would be no interference with the privilege against self-incrimination. The obviousness of this answer suggests the *Ives* and *Siciliano* courts were more concerned with denying the need for formal inquiry of the defendant than they were in providing a rationale for the practice of not inquiring. In each case the court just did not believe that the defendant was unaware that he had a right to testify.

The defendant in *Siciliano* asserted in his habeas corpus affidavit that his attorney refused to allow him to testify in his own behalf. The court held that this assertion did not require the district court to hold an evidentiary hearing on his claimed denial of his constitutional right to testify. *Id.* at 31. Although nothing in the record before the court indicated that Siciliano knew that he had the constitutional right to override his attorney, the court treated his acquiescence at the trial in his attorney's advice as in effect a waiver of the constitutional right. Conduct, without proof of knowledge of the constitutional right, was enough.

All circuit courts reaching the question have held that courts have no affirmative duty sua sponte to address a silent defendant and inquire whether he knowingly and intelligently waives the right to testify. *Ortega v. O'Leary,* 843 F.2d 258, 261 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 110, 102 L.Ed.2d 85 (1988); *Siciliano,* 834 F.2d at 30; *United States v. Bernloehr,* 833 F.2d 749, 751–52 (8th Cir.1987); *United States v. Janoe,* 720 F.2d 1156 (10th Cir. 1983), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984); *see also Wright v. Estelle,* 572 F.2d at 1073 (Thornberry, J., concurring) (5 of 14 judges).

By far the majority of states that have considered the question also have held that courts have no duty sua sponte to advise the defendant of his right to testify and establish on the record that this right was waived knowingly and intelligently. Waiver of this right is presumed from the defendant's failure to testify or notify the court of his desire to do so. *E.g., State v. Allie,* 147 Ariz. 320, 710 P.2d 430, 437–38 (1985); *People v. Longwith,* 125 Cal.App.3d 400, 178 Cal.Rptr. 136 (1981); *Torres–Arboledo v. State,* 524 So.2d 403, 409–11 (Fla.1988); *Aragon v. State,* 114 Idaho 758, 760 P.2d 1174, 1179 (1988); *State v. McKinney,* 221 Kan. 691, 561 P.2d 432 (1977); *Commonwealth v. Waters,* 399 Mass. 708, 506 N.E.2d 859, 864–65 (1987); *Commonwealth v. Guess,* 23 Mass.App. 208, 500 N.E.2d 825, 827–28 (1986); *People v. Simmons,* 140 Mich.App. 681, 364 N.W.2d 783 (1985); *In re Mecier,* 143 Vt. 23, 460 A.2d 472 (Vt.1983); *State v. Albright,* 96 Wis.2d 122, 291 N.W.2d 487 (1980). *Contra, People v. Curtis,* 681 P.2d 504 (Colo.1984); *Culberson v. State,* 412 So.2d 1184, 1186–87 (Miss. 1982) (suggested but possibly not required); *State v. Neuman,* 371 S.E.2d 77 (W.Va. 1988).

At least seven reasons have been given for this conclusion: First, the right to testify is seen as the kind of right that must be asserted in order to be recognized. *See Siciliano,* 834 F.2d at 30, *quoting Ives,* 504 F.2d at 939–40. Second, it is important that the decision to testify be made at the time of trial and that the failure to testify not be raised as an afterthought after conviction. *See Mecier,* 460 A.2d at 475. Third, by advising the defendant of his right *to* testify, the court could influence the defendant to waive his right *not to* testify, "thus threatening the exercise of this other, converse, constitutionally explicit and more fragile right." *See Siciliano,* 834 F.2d at 30. Fourth, a court so advising a defendant might improperly intrude on the attorney-client relation, protected by the Sixth Amendment. *See Bernloehr,* 833 F.2d at 752 n. 2. Fifth, there is danger that the judge's admonition would introduce error into the trial. *See Albright,* 291 N.W.2d at 492. Sixth, it is hard to say when the judge should appropriately advise the defendant—the judge does not know the defendant is not testifying until the defense rests, not an opportune moment to conduct a colloquy. *See Hennessey,* 502 N.E.2d at 947. Seventh, the judge should not interfere with defense strategy. *See Goodwin,* 770 F.2d at 637.

■ For all these convergent reasons we join other circuits and the majority of states in concluding that the court has no duty to advise the defendant of his right to testify, nor is the court required to ensure that an on-the-record waiver has occurred. The defendant's conduct provides a sufficient basis from which to infer that the right to testify has been waived.

The dissent begins with the indisputable proposition that you can't waive what you do not know you have. The dissent then points out that the defendant did not know he had a constitutional right to testify that he could exercise despite his lawyer's advice. The defendant did not know he had this right, nor did anyone else, for this right had never previously been recognized. Consequently, the defendant did not waive the right. Q.E.D. The dissent has set up a right which Martinez could not have waived.

Such a strange conclusion suggests that there is an error in the dissent's premises. It is not too hard to find. The dissent assumes that the defendant had to know the exact dimensions of his right to testify.

But to waive his right all that he needed to know was that the right existed.

That he knew that the right existed, *i.e.*, that he knew the state could not bar him from being a witness, is plain from his colloquies with his lawyer. Educated by television and past courtroom experience of his own, Martinez had seen criminal defendants take the stand. He knew he had a right to be heard if he chose. His lawyer did not deny that he did. The defendant's knowledge of his right led him to insist. Respect for his lawyer's judgment eventually led him not to persist.

Martinez did not lose the right to testify through any action of the prosecution. Martinez did not lose the right to testify through any action or oversight of the court. Prosecution and court were entirely unaware that he was frustrated in his desire to take the stand. The state did not muzzle Martinez. His disappointment occurred through the decision of his own lawyer.

To hold that a defendant may abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government. *Bernloehr*, 833 F.2d at 752 ("[a] defendant may not … indicate at trial his apparent acquiescence in his counsel's advice that he not testify, and then later claim that his will to testify was 'overcome.'"). As Justice Cardozo long ago reminded us, justice is due the accuser as well as the accused. *Snyder v. Massachusetts*, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934). Fundamental unfairness would characterize a process that let defendants have one trial based on their lawyer's strategy and another trial based on their own. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065–66.

The opportunity to address the court before sentence is pronounced—the right availed of by Thomas More at a time when English law did not permit the accused to give evidence at all—is carefully preserved by Fed.R.Crim.P. 32(a). The court is under an obligation to address the defendant personally and, before sentencing, ask if the defendant wishes to make a statement in his own behalf. The concerns of the dissent for a defendant who will never have a chance to speak in court are misplaced.

In subtle form the dissent patronizes Martinez by suggesting that there is greater recognition of his personal dignity in invalidating the results of the trial than in affirming the judgment. The patronizing occurs in the assumption that Martinez, who was capable of selecting vigorous counsel, was incapable of simply rejecting counsel's advice or speaking to the court or discharging his lawyer. No doubt there are occasions when benefits are conferred by those who patronize, but the benefits conferred are at the expense of the dignity of every human person. *Adams* rejected this kind of paternalistic projection of incompetence on to a criminal defendant. *Adams*, 317 U.S. at 278–81, 63 S.Ct. 241–43. For better or worse Martinez stayed with Weight. For better or worse Martinez acted upon his lawyer's advice. To recognize that a person may commit himself even though the consequences are not what he would wish, is to recognize the most fundamental of human capabilities. Personal dignity is not honored but diminished when the capacity to commit one's self is implicitly denied.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting.

Bobby Martinez sought to testify in his own defense. He repeatedly asked his attorney to put him on the stand, but he was refused the opportunity to testify in absolute terms. "I told Mr. Martinez that I was not going to call him as a witness in his defense. He expressed to me the desire to testify; and I said no way, that I thought it was suicidal for him to testify, and it would be an error in judgment; and that was it. I just made the decision he was not going to testify, I refused to call him, and that was the way it went down." (testimony of Michael Weight).[1] Trial

---

1. Weight stated at the trial court's evidentiary hearing on the motion for a new trial that

during trial preparation questions about testifying arose several times. At the end of pretrial

counsel neither phrased his refusal in terms of advice nor intimated that Martinez possessed any options except succumbing to the dictates of counsel. Neither the trial court nor the Assistant United States Attorney ever suggested to Martinez that he could do more than bear silent witness to his own proceeding. The record before us reveals that appellant was neither informed nor independently aware that he was free to override the considered choice of counsel. Yet, the majority holds that Martinez waived his fundamental right to testify in his own defense.

This court unanimously concludes that the right to testify is a fundamental right that belongs to the defendant. By definition, the majority concedes that only the defendant, himself, may make the decision, and that he does not cede it to his attorney by electing to be represented by counsel. However, what the majority giveth with one hand, it taketh away with the other. It divines a constitutionally sufficient waiver of Martinez' fundamental rights from the ambiguous face of trial silence. This relinquishment is inferred from the defendant's failure to interrupt the proceedings and take over the case from his lawyer, despite the absence of any indication on the record that Martinez was aware of his rights or how to assert them. Under this definition of a "knowing and intelligent" waiver, even a wholly uninformed defendant can through inaction give informed consent to an otherwise constitutionally deficient proceeding.

In my view, the majority errs on three different levels. It finds a waiver in the absence of (1) a colloquy between the court and the defendant on the right to testify in one's own defense, (2) any affirmative evidence on the record that the defendant wished to relinquish his constitutional right, and (3) proof that Martinez understood that he personally controlled the decision to testify. Because the majority affords inadequate protection for an important constitutional right, I dissent.

I.

A.

The accused in a criminal trial occupies a precarious position. He is the central figure in the proceeding. As the chief protagonist, the defendant, generally a poor, uneducated, sometimes illiterate person, is entitled to the "assistance" of a well-educated member of the professional bar. "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.... The counsel provision supplements this design ...[of the Sixth Amendment] ... It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant." *Faretta v. California*, 422 U.S. 806, 819–20, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). Although, in form, the accused is the principal and the attorney the assistant,[2] in practice disparate educational, economic, and experiential backgrounds invert this relationship.[3] The criminal defendant, fighting on unfamiliar terrain, is forced to rely completely on the

preparation, Weight foreclosed further discussion of the issue. "I told him in no uncertain terms I was not going to put him on, period. No ifs, ands or buts." At trial, as the defense rested its case, appellant again attempted to reopen counsel's decision not to put him on the stand. Martinez urged Weight to move for a recess so that he could again try to persuade him that he should be allowed to testify. In appellant's words, Weight just "nudge[d] me off."

2. The concept of the attorney as agent grew from the Greek practice of hiring ghostwriters for speeches written for litigants before the Athenian assembly. *See* Tigar, *Supreme Court Foreward: Waiver of Constitutional Rights: Dis-*

*quiet in the Citadel,* 84 Harv.L.Rev. 1, 16 (1970) (citing R. Pound, *The Lawyer from Antiquity to Modern Times* (1953)).

3. Many lawyers quickly shed the form of the attorney-client relationship. Crucial trial decisions are formulated and implemented without informing the client of the course of the litigation, much less obtaining his consent. "[A] lawyer must never forget that he is the master. He is not there to do the client's bidding.... The lawyer must serve the clients' legal needs as the lawyer sees them not as the client sees them." Haynesworth, *Professionalism in Lawyering*, 27 S.C.L.Rev. 627, 628 (1976). *See also* Mazor, *Power and Responsibility in the Attorney–Client Relation*, 20 Stan.L.Rev. 1120 (1968).

expertise of an attorney who is familiar with obscure rules, arcane language, and cryptic doctrine.[4] Unilateral decision-making by defense counsel is frequently the norm.[5] Modern criminal procedure—punctuated by hallway deals and rapid-fire trials—necessarily deviates significantly from the Sixth Amendment's model of adjudication.[6] Within this legal system, rules designed to protect basic rights cannot rest solely upon theory but must conform to the realities of courtroom decision-making.

## B.

In certain areas of the criminal law, dependency upon counsel is anticipated and melded into the legal system. The criminal lawyer, due to his expertise and training, is given primacy in areas requiring technical skill and familiarity with legal tactics. He directs objections to evidence, the examination and presentation of witnesses, and the narrowing of issues on appeal. *Jones v. Barnes*, 463 U.S. 745, 751–54, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983).[7] He decides which witnesses to call, how to examine them, and whether and in what manner to cross-examine. *See also Brookhart v. Janis*, 384 U.S. 1, 8–9, 86 S.Ct. 1245, 1249, 16 L.Ed.2d 314 (1966) (Harlan, J., concurring) ("I believe a lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval. The decision, for example, whether or not to cross-examine a specific witness is, I think, very clearly one for counsel alone").[8] Thus, counsel controls even constitutionally protected tactical choices. *See, e.g., Estelle v. Williams*, 425 U.S. 501, 508 n. 3, 96 S.Ct. 1691, 1695 n. 3, 48 L.Ed.2d 126 (1976) (wearing prison clothes at trial).[9] These tactical decisions

4. Without the "guiding hand" of counsel, the accused may be unable to avoid the pitfalls of the legal system. "Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether that indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge and convicted upon incompetant evidence or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one." *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

5. *See, e.g.,* Strauss, *Toward a Revised Model of Attorney–Client Relationship: The Argument for Autonomy*, 65 N.C.L.Rev. 315, 320 (1987).

6. *See generally* Tigar, *supra* n. 4 at 26. Professor Tigar describes a criminal justice system that mocks solemn descriptions of citadels of justice and palladiums of liberty. Without proper procedural safeguards, the defendant, who "seldom either knows or cares about the subtleties of criminal procedure or elevated constitutional ideals," may lose important constitutional rights amidst the turmoil of trial. *Id.*

7. The allocation of decision-making has been described in terms of a means/ends analysis. The defendant determines the ultimate goals of the litigation while the lawyer plots the best method of arriving at that conclusion. *See* Strauss, *supra* n. 5 at 318; Spiegel, *Lawyering and Client Decision-making: Informed Consent and the Legal Profession*, 128 U.Pa.L.Rev. 41

(1979). For instance, decisions whether to object to evidence, subpoena certain witnesses, or question jurors on racial bias are left to the sound discretion of the trial lawyer. *See Gustave v. United States*, 627 F.2d 901 (9th Cir. 1980); *Nelson v. State*, 346 F.2d 73, 81 (9th Cir.), *cert. denied*, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965). Conversely, decisions that encompass the ends of litigation cannot be relinquished through the unilateral action of counsel.

8. Although the decision of whether and how to cross-examine an adverse witness is constitutionally protected, it is principally a tactical choice requiring familiarity with legal rules and strategy. Consequently, the decision to waive cross-examination is for the lawyer, and, therefore, the issue of waiver discussed at length by the majority, maj. op. at 759, is simply inapplicable.

9. In *Williams*, the defendant, jailed due to an inability to raise bail, was dressed in prison clothing during trial. Although the prison garb may have raised a presumption of guilt in violation of the fundamental fairness requirements of the Due Process Clause, defense counsel failed to object. The Supreme Court described the decision not to object in strictly tactical terms. "The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." 425 U.S. at 508, 96 S.Ct. at 1695. The majority reasoned that since control over this catagory of trial objection was ceded to counsel waiver could be inferred from counsel's failure to act. Chief Justice Burger specifically distinguished the prison clothes

are ceded to counsel because the attorney presumptively possesses the unique training necessary to make the determination how best to exploit fully the defendant's legal rights.

## II.

There is, however, a class of constitutional decisions that is preserved for the defendant and for the defendant alone. These choices implicate rights that are both personal and fundamental. Only the defendant may waive these rights. *See Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962). Since this panel is now in complete agreement that the decision to take the stand is personal to the accused, I see no reason to belabor the point and instead turn to the question of waiver.[10]

## A.

To prove a waiver of a fundamental and personal constitutional right, the government must establish the existence of a waiver and the fact that the relinquishment was both knowing and intelligent; in doing so, it must overcome the strong presumption that no waiver occurred. In this case, the prosecution cannot meet this rigorous standard. It cannot show either a waiver

*or* that the purported waiver was informed and intelligent.

The Supreme Court has crafted procedural protections to guard against a court upholding an apparent but unintended or ill-informed waiver. Under the basic procedure for relinquishing a personal right, the trial court engages the defendant in an on-the-record dialogue to confirm that any proposed waiver meets the constitutional standard. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (right to counsel). *See also Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (guilty pleas); *Adams v. United States ex rel. McCain,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (trial by judge or jury). Because a defendant is generally unfamiliar with constitutional rights and the rules of court, failure to object at trial to the deprivation of a personal right may not indicate tacit approval of actions of the court or his attorney. In order to minimize the risk of an unintentional relinquishment, the Supreme Court has required a clear and unequivocal record showing that the trial judge informed the defendant of the nature of his rights and that the defendant volitionally waived these rights in open court.[11] Absent such a colloquy, the defendant has not legally abandoned his personal rights.[12]

from a relinquishment of a personal right. "... [I]t ... [is] ... difficult to conceive of an accused making a knowing decision to forego the fundamental right to the assistance of counsel, absent a showing of conscious surrender of a known right." *Id.* at 508 n. 3, 96 S.Ct. at 1695 n. 3.

**10.** Experienced litigators such as Anthony Amsterdam and Edward Bennett Williams have noted that the decision whether or not to testify can be the single most important factor in the criminal case. *See* Amsterdam, *Trial Manual for the Defense of Criminal Cases* § 390 (3d ed. 1974); Williams, *The Trial of a Criminal Case,* 29 N.Y.St.B.A.Bull. 36, 42 (1957).

**11.** Here, under the standards adopted in cases involving waivers of constitutional rights, a trial court should advise a defendant that he has a constitutional right to testify and that neither the court nor defense counsel can under ordinary circumstances prevent him from exercising that right. The defendant should also be informed that he has a constitutional right not to testify and that a decision to take the stand

waives the privilege against self-incrimination. *See Hollenbeck v. Estelle,* 672 F.2d 451 (5th Cir.), *cert. denied,* 459 U.S. 1019, 103 S.Ct. 383, 74 L.Ed.2d 514 (1982); *People v. Curtis,* 681 P.2d 504, 514 (Colo.1984). The defendant should be questioned to ascertain whether he understands the ramifications of the decision to testify (i.e. that the prosecution can cross-examine and that he may be impeached by past criminal behavior or prior inconsistent statements).

**12.** Some courts have suggested that trial judges should make inquiry only upon some indication of conflict between a defendant and his counsel. *See Siciliano v. Vose,* 834 F.2d 29 (1st Cir.1987) This procedure is administratively cumbersome and would force complex inquiries into cause. Consequently, when a defendant closes his case without testifying, the district court, as a matter of practice, should inquire into personal waiver out of the presence of the jury. These procedures closely track the rule in most personal waiver contexts. *See Curtis,* 681 P.2d at 515. *Cf. United States v. Ives,* 504 F.2d 935, 939 (9th Cir.1974), *vacated on other grounds,* 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975).

The rationale for the rule requiring the trial court to advise the defendant fully of his rights is as clear as the rule itself. Since the rights involved are fundamental to a fair trial, courts have a "serious and weighty responsibility" to insure that the relinquishment of a vested constitutional right is made in a clear and informed manner. *Johnson,* 304 U.S. at 465, 58 S.Ct. at 1023. A criminal defendant, unfamiliar with the intricate rules binding the Constitution to the criminal trial, may simply not comprehend his rights. Absent instruction on the substantive rules, a defendant could all too easily lose fundamental privileges in the shuffle of trial.

The rule requiring the trial court to outline the defendant's rights and question him on his understanding forms the basic procedure for the waiver of personal and fundamental rights. While the question whether the trial court should fully advise the defendant of his right to testify is an issue of first impression in this circuit, in my view, the decision to testify "like the right to determine what plea to enter, the right to a jury trial, the right to counsel, and the right to be present at trial, is so fundamental that procedural safeguards must be employed on the record to insure that the defendant's waiver of the right to testify was made voluntarily, knowingly, and intelligently." *State v. Neuman,* 371 S.E.2d 77, 81 (W.Va.1988). As the majority freely acknowledges, the right to testify in one's own defense is personal to the defendant; its free exercise hinges upon the accused's understanding of his privileges and of the rules of waiver. As with other personal rights, the right to testify, a fundamental right central to the fairness and dignity of the criminal trial, might be unwittingly lost in the absence of intervention by the trial court. Since the colloquy rule lessens the chance of an uninformed or unintelligent waiver, there is ample reason to apply the settled rules of personal waiver in this context. Consequently, the trial court's failure to inform the defendant of his right to testify vitiates any claim that Martinez waived his fundamental right.

The majority makes several attacks on appellant's proposal to apply the general rules of waiver to the right to testify. First, my colleagues analogize to other constitutional rights, specifically the right of self-representation and the privilege against compelled self-incrimination. The majority opinion well documents the fact that several circuits, as well as a whole slew of state courts, have declined to extend the colloquy requirement to the waiver of those rights. However, the privileges at stake in those cases are fairly distinguishable from the right to testify. While the federal courts have long acknowledged the right of self-representation,[13] the right is disfavored by the courts. We have recognized from the first formulation of the *Faretta* doctrine that the exercise of the right may operate to the detriment of the defendant and may frustrate the fairness goals of the criminal trial. *See Faretta,* 422 U.S. at 832–34, 95 S.Ct. at 2539–40. The exercise of the right to self-representation necessarily waives the right to counsel, the most pervasive and far-reaching of constitutional privileges. *See Penson v. Ohio,* — U.S. —, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988). Courts actively discourage this practice, and have declined to require a colloquy because of the detrimental effect on the preeminent right to counsel. *See United States v. Weisz,* 718 F.2d 413, 425 (D.C.Cir.1983) ("the exercise of the right to self-representation necessarily involves a waiver of the preeminent right to the assistance of counsel"); *Brown v. Wainwright,* 665 F.2d 607, 610 (5th Cir.1982) (en banc).[14] Thus, the self-representation analogy is not persuasive.

13. *See Faretta,* 422 U.S. at 830, 95 S.Ct. at 2538.

14. The majority also relies heavily on *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). *Wiggins,* however, dealt with a different question. In *Wiggins,* the defendant waived his right to counsel. As far as the record indicates, the trial court properly inquired whether the defendant made a knowing and intelligent waiver. Later, Wiggins allowed standby counsel to make several motions and argue the closing statement to the jury. Wiggins did not contend that the trial court erred in not making an extended inquiry into whether the defendant understood his right to self-representation. Consequently, the Court

The majority's analogy to the rules surrounding the privilege against self-incrimination is somewhat more pertinent. *See, e.g., United States v. Wagner,* 834 F.2d 1474, 1483 (9th Cir.1987). In *Wagner,* we held that the trial court has no affirmative duty to inform the defendant of his Fifth Amendment rights when he voluntarily takes the stand. In doing so, we made an exception regarding a right the courts zealously protect. While we offered little explanation for our decision, we may well have been motivated, at least in part, by a desire to avoid placing any significant impediment in the way of defendants seeking to exercise their fundamental right to testify in their own defense. Moreover, it would be incorrect to infer from *Wagner* that the government is under no obligation to inform the defendant of the existence of the Fifth Amendment privilege. In fact, the first instruction given to the defendant as part of the accusatorial process includes his right to remain silent. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, from the inception of the prosecution, the defendant is made aware of that right. The situation is drastically different with respect to the correlative right to testify. No similar instructions are given during pretrial proceedings or at any other time before or during the trial. Thus, the necessity for a court-conducted collequy is exponentially greater when the right to testify is at stake.

Second, the majority distills—without comment—seven reasons from the existing case law to justify not adopting an inquiry requirement.[15] Maj. op. at 760. I address each in turn. First, "the right to testify is seen as the kind of right that must be asserted in order to be recognized." This statement is a plain example of circular reasoning and, as my colleagues would no doubt agree, not particularly helpful to the resolution of the issue before us. Second, the decision whether to testify should be made at the time of trial and not afterwards. If, by this statement, the majority is expressing some concern with involving courts in vain attempts to reconstruct trial events, I share its concern. However, a prophylactic rule of inquiry would alleviate this problem without denying the means of effectively implementing a fundamental right.

Third, the right to testify "counterpoises" the privilege against compelled self-incrimination. Therefore, the argument goes, a colloquy between court and defendant might adversely affect the right to remain silent. While requiring the trial court to inform the defendant of his constitutional right may indeed have a marginal effect on the number of times the Fifth Amendment privilege is exercised, I do not think this is a particular cause for concern.

did not address that question. *See* discussion *infra* at p. 768.

**15.** My colleagues accurately point out that the limited case law on waiver of the right to testify tends to favor their position on the merits. However, the consensus is not nearly as broad as they would suggest. The majority, but by no means unanimous, rule among state courts is to reject the colloquy requirement. *Compare In re Mecier,* 143 Vt. 23, 460 A.2d 472 (1983) (no colloquy) with *Curtis,* 681 P.2d at 514 (mandating inquiry). My colleagues cite five circuit cases to bolster their claim that the great weight of authority favors their position. A close reading of the cases reveals, however, that the issue was not reached in *United States v. Bernloehr,* 833 F.2d 749, 751–52 (8th Cir.1987) and that the Fifth Circuit could not reach a majority position in *Wright. See infra* n. 29. Moreover, although the Seventh Circuit, in *Ortega v. O'Leary,* 843 F.2d 258, 261 (7th Cir.), *cert. denied,* —— U.S.

——, 109 S.Ct. 110, 102 L.Ed.2d 85 (1988), did conclude that the trial court had no affirmative duty to conduct a waiver inquiry, the court's analysis ultimately favors my position. *See infra* § III. Our circuit has not addressed the question for well over a decade. In *Ives,* 504 F.2d at 939, the defendant, a man with a long history of mental illness, was removed from the courtroom after his outbursts disrupted the trial. Following his return, he demanded his right to testify, but, after further outbursts, was banished from the proceedings. We held, consistent with *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), that a defendant could waive his constitutional right to testify through repetitive and disruptive conduct. The court, per Judge Wallace, went on to suggest in dictum that the right to testify was waived unless demanded. Since Ives clearly had demanded his right to testify, the issue of waiver through silence was not before the court. We are, of course, not bound by dictum.

An adequate inquiry would remind the defendant that he has the constitutional right to remain silent,[16] and, as the majority itself insistently argues, basic values of personal dignity and fairness are enhanced when the defendant is presented with an opportunity to choose among relevant alternatives. Maj. op. at 761. Consequently, I do not believe that an in-court discussion attended by counsel where the judge identifies the choices available to the defendant is a threat to free exercise of the privilege against compelled self-incrimination.

Fourth, my colleagues suggest that warnings would "interfere" with the attorney-client relationship. Trial court waiver inquiries, however, have never created a problem with respect to the right to counsel, plea bargaining, jury trial or any of the other fundamental and personal rights protected under *Johnson v. Zerbst.* Fifth, "there is danger that the judge's admonition would introduce error into the trial." Maj. op. at 760. Although I am not entirely clear what the statement means, at the very least a fair inquiry would diminish the possibility of error by building a strong evidentiary basis for the trial court's rulings. Sixth, the majority expresses some doubt about when the trial court should question the defendant. However, contrary to the majority's suggestion, the moment when the defense rests is a perfectly appropriate—as well as an administratively convenient—time to conduct the colloquy. Seventh, "the judge should not interfere with defense strategy." The defense strategy, in regards to the decision to testify, is ultimately shaped by the defendant. The discussion between trial court and defendant would assist, not interfere with, that decision by insuring that the defendant was properly informed. Although this brief discussion serves only as a brief outline of the arguments against the majority's claims, it

should be clear that the majority's picture of administrative collapse is badly distorted.

### B.

Even were the normal colloquy rule inapplicable, there could be no surrender of a personal and fundamental constitutional right without an affirmative representation by the defendant that he wished to waive his rights. The most basic rule of construction in waiver cases is that a personal relinquishment cannot be inferred from the defendant's silence; *see, e.g., Barker v. Wingo,* 407 U.S. 514, 526, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972); *Boykin,* 395 U.S. at 244, 89 S.Ct. at 1712; *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968); *Ostlund v. Bobb,* 825 F.2d 1371, 1373 (9th Cir.1987); rather, if the right is personal, the trial court must direct an inquiry to the defendant. *Carnley,* 369 U.S. at 516, 82 S.Ct. at 890.[17] Most important the *record* must contain an affirmative statement by the defendant evidencing his willingness to waive the right. *See United States v. Crowhurst,* 596 F.2d 389, 391 (9th Cir. 1979); *United States v. Aponte,* 591 F.2d 1247, 1249–1250 (9th Cir.1978).

In the case before us, there is no evidence in the trial record to support a claim that Martinez ever agreed with his attorney's decision denying him the right to testify. Nor can the government point to any sentence or fragment thereof that resembles a positive waiver by Martinez of his constitutional right. In fact, the record from the evidentiary hearing on the motion for a new trial is replete with testimony that Martinez expressly objected to his lawyer's decision. Every witness at the hearing agreed that appellant repeatedly protested Weight's decision and that counsel continuously overruled his client.[18] In the

---

16. *See supra* n. 11.

17. "The record must show, or there must be an allegation and evidence which show, that an *accused* was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Id.* (emphasis added).

18. The majority also argues that Weight, Martinez' trial lawyer, rendered effective assistance

of counsel. Maj. op. at 755–56 (citing *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986)). However, the question of effectiveness of counsel is irrelevant to the determination here. Since Martinez was

absence of even a slender thread of evidence on the record to support a claim of personal waiver, I would conclude that a criminal defendant who fails to interrupt the proceedings in order to protest his counsel's conduct in open court has not made an affirmative waiver of a personal and fundamental constitutional right.[19]

Instead of applying the waiver rules, the majority adopts a demand rule, holding that the right is waived unless the defendant personally demands that the judge afford him the opportunity to testify in his own defense. Under this demand test, neither a trial court colloquy nor an affirmative statement by the defendant is required to waive the right to testify. The majority bases its arguments on the factually dubious premise that a failure to speak or act can be interpreted as a willing and intentional acquiescence. This conclusion directly contradicts the fundamental rules of construction mandated by Supreme Court precedent. Courts are bound to "indulge every reasonable presumption *against* waiver"[20] (emphasis added) and should not "presume acquiescence in the loss of fundamental liberty."[21] Demand rules are "inconsistent with ... [the Supreme] ... Court's pronouncements on waiver of constitutional rights." *Barker*, 407 U.S. at 525, 92 S.Ct. at 2189. Despite the well-established protections surrounding the waiver of those rights, my learned colleagues

indulge every presumption *in favor of* waiver, thereby turning the basic rule of constitutional construction on its head.

The genesis of the majority's unwillingness to apply the established rules governing waiver may lie in a belief that counsel's scrupulous adherence to the rules of ethics[22] and to the constitutional division of labor may limit any misperceptions that flow from the accused's lack of substantive knowledge. However, we cannot presume compliance in all cases. The realities are that in some cases the defense attorney may present the relevant information to the accused and inform him of the personal nature of the decision, while on other occasions counsel may not volunteer the constitutionally required information and may not advise his client that it is the accused who has the right to make the ultimate judgment. Sometimes, the defendant's silence signals acquiescence; other times, silence masks ignorance.

The requirement that the defendant personally and affirmatively waive personal and fundamental rights has been adopted to insure that a failure to invoke a constitutional right reflects the individual's own conscious decision. A less stringent rule would dilute basic rights and would be unfaithful to the mandatory presumption against waiver. In fashioning its demand rule, the majority leans heavily upon the Supreme Court's decision in *McKaskle v.*

---

Since Martinez was deprived of his constitutional right to testify, the reasons for the deprivation are immaterial. If counsel waives the right to a jury trial without the approval of the defendant, the reasoning behind the waiver, no matter how sage or noble, cannot change the fact that reversible error has occurred. That rule is equally applicable here.

**19.** The majority apparently believes that the existence of Federal Rule of Criminal Procedure 32(a) should mute our concern over inadequate waiver. Rule 32(a)(1)(C) requires the trial court before imposing sentence to "address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of punishment." While the existence of the Rule provides some participatory outlet for the accused, it is clearly an inadequate remedy for violation of the right to testify. The right to testify is principally a trial right, providing the defendant with an opportunity to rebut his accuser and to

influence the "subjective and elusive" judgments of the jury on the question of guilt or innocence. Providing counsel only at the post-conviction stage is too little, too late. Post-conviction statements are similarly a wholly inadequate substitute for the right to testify at trial. *See, e.g., Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

**20.** *Barker v. Wingo*, 407 U.S. 514, 525, 92 S.Ct. 2182, 2189, 33 L.Ed.2d 101 (1972) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1937)).

**21.** *Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023 (quoting *Ohio Bell Tel. Co. v. Public Utilities Comm'n*, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937)).

**22.** *See* Model Rules of Prof. Conduct 1.2(a). *See also Code of Professional Responsibility of the State of Hawaii* (1981).

*Wiggins.* However, it is clear that *Wiggins* did not interpret silence as waiver. "A defendant can waive his *Faretta* rights. Participation by counsel with a *pro se* defendant's *express approval* is, of course, constitutionally unobjectionable." *Wiggins*, 465 U.S. at 182, 104 S.Ct. at 953. (emphasis added). At trial, Wiggins made *affirmative representations* that the Court read as pronouncements of a waiver. He agreed on the record that counsel should examine a witness on voir dire and that his lawyer should present the closing statement to the jury. The accused "warmly embraced" several of counsel's motions. *Id.* at 183, 104 S.Ct. at 953. Thus, in *Wiggins,* the Court construed the defendant's statements as affirmative agreement to counsel's participation. In the case before us, there were no statements, no agreement, no "warm embrace," only the cold shoulder of silence. The *Wiggins* Court's reliance on the defendant's affirmative representations set forth in the trial record contrasts sharply with the waiver by silence rule favored by the majority here.

### III.

Even were we to concede *arguendo* that silence can, in some instances, be construed as an affirmative waiver, the silent waiver must still be knowing and intelligent. Equally important, the *record* must reflect that the defendant possesses the knowl-

edge and understanding necessary to make an informed decision. *See Boykin,* 395 U.S. at 242, 89 S.Ct. at 1711 ("[t]he requirement that the prosecution spread on the record the prerequisites of a valid waiver is no constitutional innovation"). A defendant must be aware that he possesses constitutional rights that can be exercised and that he, himself, controls the decision. Absent proof of this knowledge, no waiver can occur. As the majority acknowledges, "the general rule is clear that the relinquishment of such a right must be intentional and to be intentional must be known to the one who gives it up." Maj. op. at 756 (citing *Boykin,* 395 U.S. 238, 89 S.Ct. at 1709 (1968); *Adams,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942); *Johnson,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). If the accused is unaware of the existence of a personal right, a waiver, whether construed from silence or from some inadvertent statement, cannot pass constitutional muster.

As the Seventh Circuit concluded in an identical context, "a trial court should carefully ascertain through a methodical inquiry whether ... [the right to testify] ... has been voluntarily and intelligently forfeited." 843 F.2d at 263.[23] Searching the trial record here for evidence that appellant comprehended the nature of his constitutional right to testify is a futile exercise. There is absolutely no evidence to support an inference that he was aware that he had a personal *right* to testify or that his si-

---

**23.** In *Ortega,* the Seventh Circuit held that the failure of the district court to inquire into the purported waiver was harmless beyond a reasonable doubt. 843 F.2d at 262. The test for harmless constitutional error outlined in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) is inapplicable to the error in this case. The Supreme Court has delineated two categories of cases to which the *Chapman* test does not apply. First, because the *Chapman* inquiry involves delicate judgments about fact specific situations, errors which have an indeterminate impact upon the appellate record cannot be harmless. *See Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988). Barring the accused from the stand results in guesswork about the impact of the missing testimony—testimony which, in many cases, forms the centerpiece of the modern trial. An appellate court cannot accurately determine from the cold record what impact the defen-

dant's statements would have had on the judgments of the jury. Second, harmless error analysis, designed to insure correct outcomes, is essentially irrelevant to a panoply of constitutional rights that protect individual dignity. *See Flanagan v. United States,* 465 U.S. 259, 268, 104 S.Ct. 1051, 1056, 79 L.Ed.2d 288; *Payne v. Arkansas,* 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958). Since the right to testify serves the principles of dignity and individual choice, the rule of *Chapman* is inapplicable to the error in this case. Indeed, even were a court inclined to apply harmless error analysis, Supreme Court precedent would bar such an approach. "[T]he appellate court could not logically term "harmless" an error that presumptively kept the defendant from testifying." *Luce v. United States,* 469 U.S. 38, 42, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984). Thus, the rule of per se reversal is applicable here.

lence constituted a form of support for a decision *he* had reached to waive that right. To derive either conclusion from the blank trial record would do "violence to reality." *Glasser v. United States*, 315 U.S. 60, 72, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942).

Even if we extend our inquiry beyond the boundaries of the trial record and examine the record of the hearing on the new trial motion, we will find no support for the government's claim that Martinez knowingly and intelligently waived his rights. *Cf. United States v. Kimmel*, 672 F.2d 720, 722 (9th Cir.1982). First, the record reveals beyond debate that Martinez was unaware of the rules of waiver prescribed today by the majority.[24] My colleague's novel procedure requires the defendant to ignore the admonishments of counsel, interrupt the trial proceedings, and interject himself, uninvited, into the fray. Defendants, however, are trained to be seen but not heard. Court dictates are clear and authoritative; criminal defendants who speak without invitation are not only silenced but threatened with the judicial contempt power.[25] Appellant's uncontroverted testimony shows that he was unfamiliar with the procedures now deemed necessary to preserve one's personal right to testify.

A silent waiver becomes more pernicious, and less knowing, if the defendant loses his rights without even being aware of the procedures necessary to retain them.

Second, as the record shows with almost equal clarity, appellant was unaware that he had the right to make the final determination and override his attorney's decision not to put him on the stand. No one informed him that the determination whether or not he would testify was different from the ordinary trial decisions directly managed by counsel, including the decisions whether or not to call all other witnesses. Ordinarily, it is counsel, not the defendant, who controls the substance of a case.[26] Martinez had no reason to know that the rule was the opposite in this case. Indeed, the hearing record clearly reveals that both appellant and his counsel believed that the decision whether to put the defendant on the stand rested exclusively with the latter.[27]

Martinez' assumptions (and his counsel's) were not illogical ones. At the time of the trial, the Supreme Court had not yet definitively declared that defendants had a constitutional right to testify in their own defense[28] and until today this circuit had never articulated the rule that the right is

---

**24.** At the motion for a new trial, Martinez's testimony exhibited the confusion surrounding in-court objections by the defendant.

Q. "Did you consider standing up and telling the Court that you wanted to testify?"

A. "Yeah, but how do you stand up in a courtroom? I mean, you know, it's—well, that's what you got an attorney for. I watch enough TV; if you jump up in Court, they going to tell you to sit down, anyway."

**25.** *See, e.g., Illinois v. Allen*, 397 U.S. at 347, 90 S.Ct. at 1062 (contumacious defendant evicted from courtroom); *Ives*, 504 F.2d at 939.

**26.** *See infra* § I(A).

**27.** The majority also suggests that a court may infer appellant's knowledge of the relevant rules from the "education" of television. Maj. op. at 761. This contention is highly problematic for a number of reasons. First, it is unprecedented to stake fundamental constitutional rights on the vagaries of network programming. For instance, we do not presume an awareness of the *Miranda* warnings even though those admonitions have sunk much further into the collective

consciousness than the rules governing the right to testify. Second, even if we were constitutionally permitted to rely on the mass media, I would be wary of doing so in this subtle context. The primary purpose of police or lawyer shows is entertainment, not pedagogy. Third, even if some television shows accurately portray legal rights and duties, I am doubtful whether we could impute that knowledge to all criminal defendants. The fact that Judges Wallace and Noonan are familiar with certain television shows does not mean that indigent defendants growing up in an entirely different social milieu would own television sets, watch the same shows, or even have the same ability to understand English language programs.

**28.** The trial took place in January of 1987. *Rock v. Arkansas,* the first case clearly establishing the right to testify, was issued on June 22, 1987. 107 S.Ct. 2704. Indeed, the Supreme Court has specifically described *Rock* as a case that broke new ground and imposed new obligations not dictated by prior precedent. *See Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

personal and fundamental.[29] Admittedly, Martinez has more than a passing familiarity with the criminal justice system. But even if we expected the defendant to possess the sophistication of a member of the bar, we would still not presume that he had the foresight to chart the future course of Supreme Court and circuit law. Certainly we could not expect him to be aware of the novel procedures for asserting personal rights that the majority announces for the first time today. Given appellant's limited understanding of the nature of his rights, it cannot fairly be said that the purported waiver here was knowing and intelligent. Indisputably, the requirement that the record reflect such knowledge and understanding has not been met in Martinez' case.

Even after accurately reciting the pertinent rule, the majority reads Martinez' uninformed failure to act as a knowing and intelligent relinquishment of a personal and fundamental right. My colleagues' interpretation of the knowing and intelligent test would reduce the full constitutional protections of the *Johnson v. Zerbst* standard to empty homilies. To contend that an "informed and intelligent" waiver can be made on the basis of no information (or on the basis of general information pre-

sumed to be available to regular viewers of L.A. Law, *see supra* n. 27) divorces words from underlying values. The *Johnson* definition sought to expand the role of free choice in the criminal trial; but the significance of choice rapidly evaporates when the chooser is unaware of his choices or even of the fact that he may choose. *See Green v. United States*, 355 U.S. 184, 192, 78 S.Ct. 221, 226, 2 L.Ed.2d 199 (1957).

## IV.

In the face of precedent and practice, the majority proffers several tangled arguments to buttress its conclusions. First, the majority argues that "custom" dictates that silence be construed as a knowing waiver. Although the source of this theory is not entirely clear, my learned colleagues apparently adopt, in this portion of their opinion (and in this portion alone), a strict historical approach to the construction of constitutional rights: since the requirement that the defendant must personally and affirmatively waive his rights has never before been applied to the right to testify, then custom bars its application here. Laws and constitutional doctrine, however, grow over time, requiring new rules to fit shifting values and evolving social mores.[30]

---

**29.** The case law on the personal right to testify is relatively sketchy. We join two other circuits in holding that the decision whether to testify is preserved for the defendant. *See United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir.1987); *United States v. Curtis*, 742 F.2d 1070 (7th Cir. 1984), *cert. denied*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986). At least one other circuit has characterized the right to testify as fundamental. *See United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 119 (3d Cir.1977). *See also Poe v. United States*, 233 F.Supp. 173 (D.D. C.1964) (opinion of Skelly Wright, J., sitting by special designation). Judge Skelly Wright's analysis, however, was expressly rejected, albeit in dictum, on appeal to the District of Columbia Circuit. 352 F.2d 639 (D.C.Cir.1965). Several state courts have also concluded that the right to testify is fundamental and cannot be waived solely by counsel. *See, e.g., People v. Curtis*, 681 P.2d 504, 513 (Colo.1984): *Hughes v. State*, 513 P.2d 1115 (Alaska 1973). *But see State v. Albright*, 96 Wis.2d 122, 291 N.W.2d 487, *cert. denied*, 449 U.S. 957, 101 S.Ct. 367, 66 L.Ed.2d 223 (1980). The Fifth Circuit in an en banc decision agreed to disagree over the issue. *Wright v. Estelle*, 572 F.2d 1071, 1078 (5th Cir.)

(en banc), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978). Three judges concluded that the right to testify is personal to the defendant and not properly waived by an attorney. Five of the fourteen members of the court concluded that counsel could waive the defendant's testimonial rights. Six judges did not reach the waiver issue, instead relying on harmless error analysis. Thus, there was no functional majority for any one position.

**30.** Although Judge Noonan, steeped in the teachings of classical history, relies upon the authority of the "pious pupil Plato," I rest my case on words more recently etched into the stone of the Jefferson Memorial:

> I am not an advocate of frequent changes in laws and constitutions. But laws and institutions must go hand in hand with the progress of the human mind. As that becomes more developed, more enlightened, as new discoveries are made, new truths discovered and manners and opinions change, with the change of circumstance, institutions must advance also to keep pace with the time. We might as well require a man to wear still the coat which fitted him when a boy as civilized

Certainly, no one would now argue that the right to counsel is not fundamental or that it can be waived through silence. Yet, before 1963, neither counsel nor record inquiry was required in non-capital cases. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Similarly, as the majority carefully shows, the right to testify is a fundamental right that has evolved with the progress of constitutional doctrine.[31] Legal rules derive from social values, not from rote adherence to custom. The past does not blindly bind the present.

Second, the majority suggests that "common sense" outweighs bedrock constitutional doctrine. Even if we were somehow free to discard four decades of Supreme Court and Ninth Circuit waiver cases, I would disagree with them, because their conclusion is based on an erroneous premise. My colleagues argue that any rule that would adequately protect constitutional rights in this instance would jeopardize thousands of convictions in state and federal courts. In effect, they assume, without cause, that a reasonable rule of relinquish-

ment would be retroactive. However, it is now uncontroverted that "the Constitution neither prohibits nor requires retrospective effect." *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965). Courts may, in the interests of justice, apply new rules either retroactively or prospectively. To guide our determination, the Supreme Court has articulated three factors: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Brown v. Louisiana*, 447 U.S. 323, 328, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159 (1980) (plurality opinion) (quoting *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967)).[32] Under *Brown*, there is no reason to assume that the rule here would be retroactive.[33]

As a penultimate argument, my colleagues argue that appellant's decision to hire Michael Weight was tantamount to a knowing and intentional agreement with

society to remain ever under regimen of their barbarous ancestors.

**31.** As Judge Noonan artfully details, the right to testify was unknown to the architects of the Constitution. A defendant was barred at common law from testifying on the theory that interest undermined the reliability of any in-court statements. *See generally* 2 Wigmore, *Evidence* §§ 576, 579 (J. Chadbourn rev. 1979). However, the universal acceptance of this rule eroded so dramatically that, by 1961, the Supreme Court could confidently declare, "decades ago, the considered consensus of the English-speaking world came to be that there was no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case." *Ferguson v. Georgia*, 365 U.S. 570, 582, 81 S.Ct. 756, 763, 5 L.Ed.2d 783 (1961). Two years ago, the Court confirmed the common understanding that the testimonial privilege is a constitutional right. *Rock*, 107 S.Ct. at 2708. Although the constitutional status of the right to testify is of relatively recent vintage, this court unanimously describes it as fundamental. Thus, the majority implicitly recognizes that age or custom is not the proper touchstone for the analysis of constitutional rights. The "fundamental" nature of a constitutional right derives from its relationship to trial values, not from its date of recognition. There would appear to be a startling inconsistency in suggesting that the

status of a right can change with the times but that rules of waiver cannot match that evolving status.

**32.** The recent plurality decision in *Teague v. Lane*, — U.S. —, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), may have further restricted retroactive application of new constitutional doctrine. Although the case primarily concerned the raising of new claims on collateral attack, Justice O'Connor's opinion adopted the reasoning of Justice Harlan's famous dissent in *Disist v. United States*, 394 U.S. 244, 256, 89 S.Ct. 1030, 1037, 22 L.Ed.2d 248 (1969). The plurality concluded that rules that break new ground or impose new obligations on the government may be applied retroactively only if the government proscribed individual conduct outside its control or if the original conviction did not encompass rules designed to preserve accurately the guilt or innocence determination.

**33.** The first element of the retroactivity test focuses on the truth-seeking element of the rule. The primary thrust of the decision here is aimed at the locus of decision-making, a judgment most directly concerned with the dignity aspect of the trial. Moreover, as the majority points out, full retroactive application of the new rule might seriously threaten the orderly administration of justice. Thus, although the question is not before us today, it is likely that the Constitution would only require prospective relief.

the attorney's subsequent decisions not to put him on the stand. This conclusion, however, directly clashes with the majority's initial premise. As shown earlier, the lawyer makes certain tactical decisions, but the defendant controls other, more fundamental choices.[34] The majority launches its analysis with a precise statement that the right to testify in one's own defense is one of those decisions retained by the accused. I find it bewildering for the majority to begin its analysis by holding that the accused (and not his counsel) has personal control over the decision to testify and to conclude by reasoning that the same defendant waives that control by accepting the assistance of counsel.[35] Similarly, the majority's suggestion that Martinez should have dismissed Weight if he disagreed with his counsel's trial decisions is equally startling. It is a novel, and unwelcome, idea that the defendant may only protect his constitutional rights by firing his lawyer in the middle of trial. If a criminal defendant must dismiss counsel and disrupt the trial every time there is a disagreement over the exercise of a personal and fundamental constitutional right, the result would be either a substantial burden on the free exercise of those rights or a significant interference with the orderly administration of justice.

Finally, the majority contends that it would be "unfair" to permit a defendant to complain that he was deprived of his right to testify after he has allowed the trial to proceed to a conclusion without his testimony. The fallacy in this argument is readily apparent. "Allowed" connotes a volitional act. A defendant who is not informed that he may override his attorney's judgment and interrupt the trial cannot fairly be said to have knowingly or willingly accepted the unconstitutional proceedings afforded him. Nor can he be accused of acting unfairly when he seeks redress after learning that he has been deprived of his constitutional rights. Moreover, regardless of the fact that the government may have been without fault in this case, the prosecution is not treated unfairly when the Constitution is vindicated. To the contrary, the government as well as the defendant wins when our courts protect fundamental rights.[36]

Unabashed by the array of cases focusing on the knowledge of the individual defendant, the majority plows ahead with a test that gives only grudging support to fundamental constitutional rights. The Supreme Court has instructed us to comb each case carefully for evidence of the defendant's informed consent. The ratio decidendi for this rule is a fear that an accused may lose fundamental rights, not in the clear light of considered deliberation but in the obscuring haze of ignorance. In this case, Martinez wished to testify, repeatedly petitioned his lawyer to put him on the stand, and was continuously rebuffed. The government has not shown, and could not show, on the record that appellant was ever informed or aware that the decision whether to testify was his to make, not his lawyer's. Nor can the government demonstrate that Martinez was aware that he was required to interrupt the court proceedings and personally assert his testimonial privilege notwithstanding his lawyer's objections. In fact the record clearly demonstrates precisely the opposite. It hardly gives substance to

---

**34.** *See supra* §§ I(b), (c).

**35.** In one last irrelevant foray, the majority paraphrases Justice Cardozo's famous statement that justice is due the accuser as well as the accused. *See Snyder v. Massachusetts,* 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674 (1934). Since Justice Cardozo was elicudating the forerunner of the harmless error rule and the majority has not expressed any opinion on that issue, I take this exposition to be largely an academic one. However, in this vein, I would recall not only the cited passage but also the sentence directly preceding it. "Privileges so fundamental as to be inherent in every concept of a fair trial that could be acceptable to the thought of reasonable men will be kept inviolate and inviolable, however crushing may be the pressure of incriminating proof."

**36.** The principle that notwithstanding the absence of prosecutorial misdeeds, reversal is appropriate when a defendant is not afforded a fundamental constitutional right is hardly a novel one. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

the Court's teachings to label Martinez' inability to obtain the right he actively sought a "knowing and intelligent" waiver.

## V.

The patchwork and inconsistent holdings in this case create a rather startling contrast. Today we hold that the right to testify is fundamental and cannot be waived by counsel. In these judgments, I fully concur. Yet the majority, while conceding the centrality of the right to testify, is content to let appellant's conviction stand despite the fact that he never indicated the slightest desire to abandon this personal right. Moreover, my learned colleagues find a constitutionally adequate waiver even though Martinez was unfortunately, but understandably, unaware of the dimensions of his constitutional right or the procedure he was required to follow in order to assert it. To call the right to testify in one's own defense a fundamental value and then impute an intentional relinquishment from uninformed inaction is at once both to proclaim and to bury that right. The majority predicates its waiver argument not on precedent but on the good dictates of common sense. Even were we free to ignore the controlling influence of Supreme Court precedent, I would not agree that "common sense" could so contort the law as to provide a criminal defendant a fundamental and personal right and then infer its waiver from a silence born of ignorance.

Oddly, the majority finds my view "patronizing" and "paternalistic". It is, however, an unhappy truth that trial fairness and fundamental values hinge on legal rites shaded from those most affected by their workings. Most criminal defendants, whether they are rich or poor, educated or ignorant, lack the proper foundation to evaluate both constitutional rights and the courtroom procedures for invoking or waiving them. It is not an arrogance but a simple recognition of that fact to conclude that a silent and uninformed waiver is no waiver at all.[37]

---

**37.** I am confident in any event that the defendant, when informed that the majority has shielded him from the evils of paternalism, will share the mixed gratitude of Sir Thomas More. When Sir Thomas learned that King Henry VIII had commuted his sentence from hanging, drawing and quartering to a more genteel beheading, he replied: "God forbid the King should use any more such mercy to any of my friends, and God bless all my posterity from such pardons." *Trial of Sir Thomas More*, 1 Howell's State Trials 385, 394 (1535).