**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George Horacio LORENZO,
Defendant-Appellant.**

No. 77–1856.

United States Court of Appeals,
Ninth Circuit.

Feb. 21, 1978.

Michael Tryon, Asst. Federal Public Defender, Phoenix, Ariz., for defendant-appellant.

W. Ronald Jennings, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before TRASK, WALLACE and ANDERSON, Circuit Judges.

WALLACE, Circuit Judge:

Lorenzo was convicted of possessing and attempting to pass counterfeit United States currency in violation of 18 U.S.C. § 471 (1970). He raises four questions on this appeal: Whether there was a violation of his due process rights when a government agent testified that Lorenzo remained silent in the face of an accusatory question during a post-*Miranda* warnings interrogation; whether the granting of a mistrial and subsequent retrial was double jeopardy; whether reversible error was committed in the failure to give certain requested jury instructions; and whether the evidence was sufficient to sustain the conviction. We affirm.

I

Lorenzo is a native of Argentina. In 1968, he moved to Canada where he worked in electronics and operated an importing business. In connection with his importing business, he occasionally returned to Argentina. During one such trip, he claims to have met one Fernando Sirus. The government denies the existence of Sirus, contending that it is merely an alias used by Lorenzo.

Lorenzo claims that in August 1969, Sirus visited him in Canada and stayed in Lorenzo's house trailer which was located several miles from his home. Lorenzo testified that he told Sirus that he was planning to move to Lake Havasu, Arizona. Sirus allegedly expressed an interest in going into business with Lorenzo and agreed to meet him at Lake Havasu.

Lorenzo testified that sometime after Sirus departed, two of Lorenzo's acquaintances, Vincente Laca and Vincente Laca, Jr., helped him clean and pack his trailer and accompanied him on the trip. When they arrived in Lake Havasu on August 13, Lorenzo rented space in a trailer park and the three men continued to share living quarters in the trailer.

On August 21, 1976, Lorenzo, Laca Jr., and a third individual were having a drink at an inn at Lake Havasu. Lorenzo attempted to pay for the drinks by giving a

counterfeit twenty dollar bill to the waitress. The bill did not seem right to the waitress and she returned it to Lorenzo, informing him of her opinion. He asked her for the basis of her conclusion and she replied that the paper did not feel legitimate. Lorenzo "half-smiled" or "smirked" and asked what he could do with the bogus bill. He then gave the waitress a valid ten dollar bill and continued his conversation and drink.

Several minutes later, a deputy sheriff arrived to question Lorenzo. He gave the officer the bogus bill. After a brief interview, the deputy made an appointment to see Lorenzo the following day and then excused him. Instead, after talking with his supervisor, the officer went directly to the trailer and invited Lorenzo and the Lacas to follow him to the sheriff's station and they did so.

At the station, Lorenzo was formally arrested and advised of his constitutional rights. Lorenzo told the officer that he had obtained the counterfeit bill on August 13 at a bank in Lake Havasu when he cashed a $100 bill.

Later the same day, two Secret Service agents interviewed Lorenzo. He repeated the same explanation of how he came into possession of the bill. He also gave the agents permission to search his trailer.

During their search of the trailer, the agents found the following items: (1) forty-six counterfeit twenty dollar bills, located in a utility storage area under the bottom drawer of a set of drawers under the refrigerator, (2) an envelope containing a bogus fifty, twenty, and ten dollar bill and seventy-one dollars in legitimate currency, discovered in a briefcase, and (3) a passport, Canadian Social Security card, identification card, and birth certificate, all in the name of Fernando Sirus, also discovered in the briefcase.

Some ten minutes after the agents left the trailer, Laca Jr. inspected the storage area where the counterfeit twenties were found and encountered a box containing over $100,000 in counterfeit bills.

Lorenzo told the officers that he had received the money found in the briefcase from Sirus for the use of the trailer while Sirus was in Canada. He also claimed no knowledge of the counterfeit bills found in the storage compartment. He stated that he thought the area contained a water tank rather than storage space.

On appeal, Lorenzo's principal contention centers around the following testimony by one of the Secret Service agents:

During the search of that trailer and the area I was conducting the search of, I had occasion to go through the contents of two briefcases that he had there. In his brown briefcase, I found some currency which was genuine. It was rolled up and wrapped in an elastic band. Of course I took the elastic band off and examined it to determine if it was, any of it was counterfeit. As I say it was all genuine. That consisted of sixteen ten dollar bills, sixteen five dollar bills and fifty-six one dollar bills.

As I stated before, Mr. Lorenzo was present so at that time, I asked him, in view of the fact that he had almost—or in the neighborhood of $300 cash in small change, tens, fives, and ones, and in view of the fact that he turned over to the deputy seventy-five genuine twenty dollar bills among other cash that he had at the time he was arrested, if he didn't think it was a little silly that he had gone to the bank to cash a hundred dollar bill to get three twenties, a ten, and a couple of fives. He didn't reply to that.

Q. Did he make any response at all?
A. Comment? To that comment, he made no response.

I then asked him or explained to him that this appeared to be the result of passing sixteen counterfeit twenty dollar bills and explained that if a twenty dollar bill is passed, it would normally be to purchase a small item worth a dollar or two and get the maximum change. If you pass sixteen twenty dollar counterfeits, you would get back something in the neighborhood of the change contained there, the sixteen tens, the sixteen fives

and the fifty-six dollars. I asked him if that didn't indicate to him that the money there was the result of passing counterfeit activities. He shrugged and mumbled something that I was not able to distinguish in response to that.

## II

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This principle is "the essential mainstay of our adversary system." *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). Moreover, this "privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Id.*

In addition to allowing criminal defendants to remain silent, the Constitution also prohibits the government from using that silence as inferential evidence of the defendant's guilt. "The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." *Miranda v. Arizona, supra*, 384 U.S. at 468 n. 37, 86 S.Ct. at 1625.

In the case now before us, the government argues that Lorenzo's initial acknowledgement of his *Miranda* rights, together with his willingness to cooperate and answer the agent's questions, constituted a "voluntary, knowing, and intelligent waiver" of those rights. Thus, the government contends, he had already declined to exercise his right to remain silent and cannot now rely upon it to avoid the inculpatory implication of his conversation with the agent.

No question is raised as to the voluntary waiver of his right to remain silent. Indeed, he stated that he wanted to talk with the police officers. There is no indication in the record other than courteous treatment by the officers and willing cooperation by Lorenzo.

As to one question, however, there was no answer given. Questions before and after were answered. The issue presented is whether the non-answer to one of the questions may be related by the testifying officer.

There is, however, a threshold question of whether Lorenzo may raise the issue now, having failed to object during the trial. We were recently confronted with a similar issue in *United States v. Lopez* (9th Cir. 1978), in which there was an unobjected-to comment made during argument on the failure of the defendant to offer any exculpatory explanation subsequent to the receipt of *Miranda* warnings. In *Lopez*, we carefully defined the difference between reviewable, unobjected-to plain error and reversible error. In this case, however, we conclude that the district court committed *no* error in allowing the challenged testimony and thus we need not concern ourselves with whether the alleged "error" meets either the standard of reviewability or reversibility.

Clearly, the waiver of *Miranda* rights by a person being interrogated is not irrevocable. *Miranda* and its progeny allow an interrogee effectively to withdraw his waiver and fully assert his Fifth Amendment rights in the midst of the interrogation process.

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.
>
> \*   \*   \*   \*   \*   \*
>
> Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated.

*Miranda v. Arizona, supra*, 384 U.S. at 473–74; 475–76, 86 S.Ct. at 1627–1628.

It is also clear that a suspect may, if he chooses, selectively waive his Fifth

Amendment rights by indicating that he will respond to some questions, but not to others. We recognized such a selective waiver in *Egger v. United States*, 509 F.2d 745, 747 (9th Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 61 (1975) (wrongful prosecutorial comment on exercise of Fifth Amendment rights was harmless beyond a reasonable doubt).

The precise question here is whether Lorenzo's failure to respond to one question put by the interrogating agent constituted either a total or a selective revocation of his earlier waiver of his Fifth Amendment rights. We hold that it did not.

In *United States v. Ford*, 563 F.2d 1366 (9th Cir. 1977), we held that intermittent silences in response to certain questions by officers did not revoke an earlier waiver of *Miranda* rights. There, the officers were courteous and did not exert pressure. The defendant, after being given her *Miranda* rights, willingly agreed to talk with them, and she continued to answer questions willingly following the periodic silences. In concluding that the conduct of the defendant did not amount to the exercise of her Fifth Amendment rights selectively or totally, we stated:

> There is nothing to indicate that the silences amounted to anything more than the uncomfortable pauses that the district judge found them to be.
>
> The court below was correct in its ruling that the government had sustained its "heavy burden" of proof that the appellant had made a voluntary, knowing and intelligent waiver of her right to remain silent . . . and that appellant had not revoked that waiver.

*Id.* at 1367.

■ We find the facts of this case legally indistinguishable from those in *Ford*.

Although we do not have the benefit of the trial court's ruling on this issue, we conclude from the record that in light of the willingness with which Lorenzo began to talk to the officers—and continued to do so after his failure to respond to a single question—he cannot be said to have invoked his right to remain silent.[1] Under the circumstances, Lorenzo's failure to respond was not "insolubly ambiguous," *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and it was thus not error to allow testimony as to that event.

### III

Lorenzo's next claim of error is that he was impermissibly subjected to double jeopardy. After deliberating a little over three hours, the jury foreman reported that it would be impossible to arrive at a verdict. The district judge questioned each juror, and all agreed that there was no possibility that the deadlock could be overcome by further deliberations. As a result, the jury was discharged and Lorenzo was retried.

In *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824), the Supreme Court held that double jeopardy principles are not violated where "manifest necessity" justifies the discharge of a jury unable to reach a verdict. Lorenzo contends, however, that here there was no manifest necessity to declare a mistrial and that therefore his double jeopardy rights have been violated. We disagree.

The Supreme Court has wisely left the determination of manifest necessity to the sound discretion of the trial judge with the caveat that

> the power ought to be used with the greatest caution, under urgent circum-

---

1. Since we conclude that Lorenzo did not exercise his *Miranda* rights at all, we need not decide in what manner he would have been required to revoke his earlier waiver only selectively rather than totally.

Total revocation, of course, requires only that the individual indicate in some manner that he wishes to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Selective exercise of the right to remain silent was accomplished in *Egger*, by contrast, by the suspect's initial, express declaration that such was his intent. It may well be that the selective exercise of one's Fifth Amendment rights—or at least a selective revocation of an earlier complete waiver of those rights—requires that some kind of communication to that effect be made to the questioning officers. Since this issue is not before us, however, we do not decide it.

stances, and for very plain and obvious causes . . . .

*Id.*

In *United States v. See,* 505 F.2d 845 (9th Cir. 1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975), we designated several factors to be considered when reviewing a declaration of mistrial and noted that the "crucial factor" is whether the jury itself believes that it is "hopelessly deadlocked." *Id.* at 851.

■ Here, the district court determined from questioning each member of the jury that it was their belief that their differences were irreconcilable. Although it is true that the jury had been deliberating for only a little over three hours, the district court did not abuse its discretion in light of the jurors' belief that a verdict could not be reached and the fact that the brief trial itself presented no complex factual questions. *See United States v. Brahm,* 459 F.2d 546 (3d Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972) (mistrial after five hours of deliberations in a two-day trial); *United States v. Cording,* 290 F.2d 392 (2d Cir. 1961) (mistrial after nearly four hours of deliberations). *But see United States ex rel. Webb v. Court of Common Pleas,* 516 F.2d 1034 (3d Cir. 1975) (abuse of discretion in declaring mistrial after six and one-half hours of deliberations—but six-day trial and judge only received foreman's opinion as to hopeless deadlock).

### IV

■ We need not spend much time on the remaining claims of error. Lorenzo asserts that the district judge committed reversible error in failing to give certain requested jury instructions. He contends specifically that his theory of the case was not presented. *See United States v. Noah,* 475 F.2d 688, 697 (9th Cir.), *cert. denied,* 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973). Lorenzo may not now properly question the adequacy of the challenged instructions given during the first trial. The declaration of a mistrial rendered such errors, if there were any, harmless.

Finally, Lorenzo attacks the convictions as not supported by the evidence. Reviewing the evidence in a light most favorable to the prevailing party, here the government, *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974), we conclude that there was substantial evidence upon which the trial judge made his determination. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

In order to convict on each of these counts, intent and knowledge had to be proven. Lorenzo argues that the government failed to establish these elements of the offenses and that his convictions must be reversed.

■ The mere passing of a counterfeit bill is not a criminal offense; rather, the government must prove Lorenzo's knowledge that it is bogus and his intent to pass the bad money. Intent and knowledge may be inferred from Lorenzo's overall actions. *United States v. Bishop,* 534 F.2d 214, 218 (10th Cir. 1976); *cf. United States v. Barham,* 466 F.2d 1138, 1140 (9th Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1356, 35 L.Ed.2d 587 (1973).

■ Not only was Lorenzo in possession of a counterfeit twenty dollar bill, but his story of receiving it from a bank turned out to be somewhat hollow when numerous similar bills were found in his trailer. Nor was the evidence of valid money in an envelope which would approximate change from small purchases with sixteen twenty dollar bills unpersuasive. Without reciting the remaining evidence which tends to show guilt, we conclude that, in total, it was sufficient.

AFFIRMED.