**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rodrigo PINO–NORIEGA,**
**Defendant–Appellant.**

No. 98–50316.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1999.

Decided Aug. 31, 1999.

Douglas C. Brown, San Diego, California, for the defendant-appellant.

Mary Kathryn Kelley and Brian M. Pearce, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

Before: O'SCANNLAIN and TASHIMA, Circuit Judges, and REED, District Judge.*

REED, District Judge:

Rodrigo Pino–Noriega appeals his conviction for importation of marijuana and possession of marijuana with intent to distribute. 21 U.S.C. §§ 841(a)(1), 952, and 960. He claims that he was denied his

right to testify in his own defense, that the district court improperly admitted lay opinion testimony as to whether his post-arrest statements "made sense," and that the district court improperly allowed the prosecution to present testimony regarding his post-arrest silence. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS

On October 13, 1997, at approximately 5:00 p.m., a United States Border Patrol pilot was flying surveillance over Imperial County, California, when he observed a brown pickup truck illegally cross the border from Mexico about 10 miles west of Calexico. The pilot observed the truck travel north, away from the border, until it met up with a grey sedan. The two vehicles traveled in tandem through El Centro and Brawley, California, until they reached a farm equipment yard about 40 miles from the border.

As Border Patrol agents on the ground closed in on the yard, the pilot observed a man in a light blue t-shirt and dark pants exit the driver's side of the truck and enter the passenger side of the grey sedan. The pilot informed the other agents that the driver of the truck, wearing a light blue shirt, had entered the passenger side of the sedan, and that the truck was still in the yard. While several agents pursued the sedan, the truck was secured and found to contain over a ton of marijuana.

With Border Patrol agents in pursuit, the sedan slowed, and a man in a light blue shirt and dark pants jumped out, ran over to the canal next to the road, and jumped in. A few seconds later, a pursuing agent pulled up to the spot where the blue-shirted man had jumped into the canal, saw that the man had floated about 25 yards down the canal, and ordered him out of the canal and arrested him. The man

---

* The Honorable Edward C. Reed, Jr., Senior District Judge for the District of Nevada, sitting by designation.

arrested, Rodrigo Pino–Noriega ("Pino"), is the appellant herein.

As the pilot watched from above, the sedan approached Brawley, with another agent in pursuit. When the scout car sped up and began driving erratically in an attempt to evade pursuit, the agent, following Border Patrol policy, broke off the pursuit. The pilot watched the car enter Brawley and stop at an apartment complex. Two people exited the car-one wearing a red shirt and dark pants, and the other wearing a dark shirt and dark pants. These two suspects were never located.

That evening, Pino was taken to the Calexico Border Patrol station. He was wearing a light blue t-shirt and dark blue pants. Pino was informed of his *Miranda* rights, in Spanish, and agreed to waive them. He was interrogated by DEA Special Agent Andrew Pappas, and Emilio Cotero, a Deputy Sheriff in Imperial County and a member of the DEA's Narcotics Task Force. Pino denied any involvement with the marijuana smugglers, although he did admit to having illegally entered the country. Initially, Pino stated that after he crossed the border, he jumped in the back of a brown pickup truck driven by a friend. After riding for a while, he thought that the truck was going to collide with another car, so he jumped out and landed on the canal bank, where he was arrested by the Border Patrol.

However, after being questioned by the agents for further details, Pino changed his story. He said that his friend never showed up, and that he hitched a ride for two to three miles and walked the rest of the way. Since he admitted to crossing the border sometime between 3:00 p.m. and 5:00 p.m. that afternoon, and since he was arrested around 6:00 p.m. some 40 miles from the border on a 100–plus degree afternoon in the desert, the agents found the new story suspect. After additional questioning, Pino changed his story again. This time, he said that after his friend failed to show up, he hitched a ride on a white pickup pulling some sort of trailer by jumping onto the rear bumper of

the truck without the driver's knowledge. Supposedly, he rode this way for about 40 minutes, then jumped off when he thought the truck was going to collide with another car. Again, he landed in the canal.

Since the agents found this story no more credible than the others, Deputy Cotero told Pino that his story did not make sense, and told him that he would tell him what had really happened. The deputy told Pino to stop him if he got it wrong, and proceeded to relate what he had learned from the Border Patrol about the events observed by the pilot from the plane. Pino initially said nothing in response to this recitation. When told by Deputy Cotero that he would be taken to the Imperial County jail and booked, Pino, stated "that while he was in the military, he learned the—capable [sic] of what traffickers can do and that we cannot arrest anybody in Mexico and that money in Mexico could buy anything, so what's the use?" At that point, the interview ended.

Pino was subsequently indicted and charged with the importation of marijuana and possession of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 952, 960, and 841(a)(1). A jury trial was held at which Deputy Cotero testified as to the several inconsistent statements Pino made after his arrest. In so testifying, Deputy Cotero commented that Pino's stories did not make sense. In relating Pino's statements, he mentioned that, after being told what the Border Patrol pilot had observed, Pino "stood there quiet." Pino did not take the stand during the trial.

On January 15, 1998, the jury informed the judge that they had reached a verdict, after approximately two hours of deliberations. Pino, the attorneys, and the judge gathered in the courtroom to receive the verdict. Before the jury was brought in, however, Pino's counsel told the court that: "Mr. Pino wants to address the jury. Apparently, he's unsatisfied with the way the trial was conducted by me." After an extensive colloquy with Pino, the court determined that he wanted to testify in his

own defense. He wanted to tell the jury "how [he] got to that place." Pino told the court initially that he had always wanted to testify, but that his attorney and several other people had argued against it, and he had felt "pressured throughout." Pino did tell the judge that he had, at some point, "agreed not to testify." He indicated that he agreed not to testify under the impression that his attorney would bring out the points he wanted brought out, but that he did not think that his attorney had ever done so. When Judge Keep asked Pino why he had not said anything before, he said: "I tried to say something, but I was taken away." The judge pointed out that this was not true, and that, after the close of evidence and the arguments, the jury had been sent out of the courtroom, and the court had conferred with Pino regarding whether he wanted to be present should the jury have any questions. The judge asked why Pino had not told her then that he wanted to testify. He responded: "I understood it to mean that you were going to be here asking me questions. When you said whether I wanted to be here during the questions, I understood it to mean that I was going to be asked the questions." Pino also stated: "I don't want to pay for something I have not done."

The judge decided not to let Pino address the jury, since they had already reached a verdict, stating: "It's too late. We'll get the verdict of the jury. We'll see what the verdict is. And after I excuse the jury, then we'll set another hearing date." The jury was then brought in, and returned a guilty verdict on both counts. Immediately after the jury was excused, the judge directed that new counsel be appointed for Pino, and set a status conference to discuss a hearing on the issue. An evidentiary hearing was held, and Pino's new counsel argued that Pino should be granted a new trial. The judge held that Pino had validly waived his right to testify in his own defense, and denied the motion for a new trial. Eventually, Pino was sentenced to 97 months in prison.

## DISCUSSION

### A. PINO WAIVED HIS SIXTH AMENDMENT RIGHT TO TESTIFY IN HIS OWN DEFENSE

■ Pino argues that he was denied his Sixth Amendment right to testify in his own defense when the district court refused to reopen the evidence and allow him to testify after the jury had reached a verdict, but before that verdict was announced. We review a district court's decision not to reopen the evidence for abuse of discretion. *United States v. Huber,* 772 F.2d 585, 592 (9th Cir.1985); *United States v. Ramirez,* 608 F.2d 1261, 1267 (9th Cir. 1979). However, a defendant's claim that he was deprived of his Sixth Amendment right to testify is reviewed de novo. *See United States v. Moreno,* 102 F.3d 994, 998 (9th Cir.1996), *cert. denied,* — U.S. —, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997).

■ The right of an accused to testify in his own defense is well established, and is a "constitutional right of fundamental dimension." *United States v. Joelson,* 7 F.3d 174, 177 (9th Cir.1993); *Rock v. Arkansas,* 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). The right stems from several provisions of the Constitution, including the Fourteenth Amendment's Due Process Clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's privilege against self-incrimination. *Rock,* 483 U.S. at 51–52, 107 S.Ct. 2704. The right is personal, and "may only be relinquished by the defendant, and the defendant's relinquishment of the right must be knowing and intentional." *Joelson,* 7 F.3d at 177.

■ However, while waiver of the right to testify must be knowing and voluntary, it need not be explicit. *See id.* A defendant is "presumed to assent to his attorney's tactical decision not to have him testify." *Id.* The district court has no duty to affirmatively inform defendants of their right to testify, or to inquire whether they wish to exercise that right. *United States v. Edwards,* 897 F.2d 445, 447 (9th Cir.

1990); *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir.1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir.1991). "[W]aiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Joelson*, 7 F.3d at 177. A defendant who wants to reject his attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or discharging his lawyer." *Id.* When a defendant remains "silent in the face of his attorney's decision not to call him as a witness," he waives the right to testify. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir.1993).

 The question presented by this case is *when* a defendant who wishes to testify must speak up to assert that right. Clearly, if the defendant says nothing until after the verdict has been read, the right has been waived. *Edwards*, 897 F.2d at 446. In the instant case, however, the defendant did speak up before the verdict was read. The problem is that, while no verdict had been announced when Pino first spoke to the court, a verdict had been reached. The jury had sent a note to the judge informing her that it had reached a verdict, and the parties had assembled in the courtroom to hear it announced. It was only then, after the jury had completed its deliberations and reached a verdict, moments before that verdict was to be delivered, that Pino asked the court to reopen the evidence so that he could testify. The court denied this request, holding that while the defendant had a right to testify in his own defense, he had waited too long to exercise that right.

 The Supreme Court has made clear that, while the right to testify in one's own defense is fundamental, that right "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," *Rock*, 483 U.S. at 55, 107 S.Ct. 2704, so long as such restrictions on the right to testify are not "arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at

56, 107 S.Ct. 2704. Interpreting *Rock*, the Eighth Circuit has held that, when the district court retains discretion to reopen the evidence, a rule generally limiting testimony to the evidence-taking phase of trial is not "arbitrary or disproportionate to the purposes [it is] designed to serve." *United States v. Jones*, 880 F.2d 55, 60 (8th Cir.1989) (citing *Rock*, 483 U.S. at 56, 107 S.Ct. 2704) (alteration in original). "While placing only a minor limitation on the right [to testify], the rule promotes both fairness and order in trials, interests which, of course, are crucial to the legitimacy of the trial process." *Id.* As in our case, Jones involved a defendant who had not asserted his right to testify until after the close of the evidence-taking stage of the trial. In *Jones*, however, the defendant sought to assert his right to testify before the case had been argued or sent to the jury. *Id.* at 60 n. 5. Nonetheless, the Eighth Circuit upheld the district court's decision not to allow the defendant to testify. *See also Neuman v. Rivers*, 125 F.3d 315, 318–19 (6th Cir.1997) (denying habeas relief to defendant who had moved to reopen the evidence and testify regarding self-defense after the judge denied the requested jury instruction at the close of defendant's case), *cert. denied*, —— U.S. ——, 118 S.Ct. 631, 139 L.Ed.2d 610 (1997).

 This Court has previously held that a defendant's right to testify is not unduly restricted by rules limiting a defendant's testimony to *relevant* matters, *Moreno*, 102 F.3d at 999, or preventing a defendant from continuing to speak, in narrative fashion, "after his counsel ha[s] finished questioning him and when no questions [are] pending." *United States v. Gallagher*, 99 F.3d 329, 332 (9th Cir.1996), *cert. denied*, 520 U.S. 1129, 117 S.Ct. 1274, 137 L.Ed.2d 351 (1997). Although our previous cases did not make it explicit, it is likewise clear that a rule requiring a defendant to assert his right to testify before he discovers that the jury has returned a guilty verdict is not "arbitrary or dispro-

portionate" to the purposes such a rule serves. *Joelson, Martinez, Edwards,* and *Nohara* were all decided well after *Rock. Joelson* and *Martinez* both discuss *Rock* in this context. *Joelson,* 7 F.3d at 177; *Martinez,* 883 F.2d at 754. By implication, at least, if *Rock* should be read to allow defendants to assert their right to testify after they have been found guilty, those cases would not have reached the result that they did.

In *Martinez* we explained that "it is important that the decision to testify must be made at the time of trial and that the failure to testify not be raised as an afterthought after conviction." *Martinez,* 883 F.2d at 760. Otherwise, "[t]o hold that a defendant may abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government." *Id.* at 761. Although *Martinez* is no longer binding precedent, its reasoning remains sound. *See Joelson,* 7 F.3d at 178 n. 1 (noting that *Martinez* was vacated because jury selection was conducted by a magistrate judge rather than a district court judge, but approving its reasoning). Once a verdict has been announced, "reopening the evidence" is not a simple matter of letting the defendant testify and then sending the jury back to reconsider its verdict and deliberate some more. It is not possible for a jury, once it has reached a verdict, to revert to a state of open-mindedness and impartiality if called back to hear the defendant's testimony and deliberate anew. There is a reason that most judges continually admonish their juries during trials not to discuss the evidence or begin deliberating until told to do so, after all of the evidence, argument, and instruction on the law has been received. As Judge Keep correctly noted below, once a jury has reached a verdict, the jurors have "discussed the ultimate issue of guilt or innocence, and they have made their decision about the strength, accuracy, reliability of all the testimony that they've heard.... They ha[ve] already looked at all the evidence. They ha[ve] collectively discussed

it. And they ha[ve] decided [whether or not] he was guilty by proof beyond a reasonable doubt .... that's too big a bell to unring."

Thus, once there is a verdict, it is too late simply to "reopen the evidence," and a new trial becomes necessary. Allowing a defendant to have two trials, one based on his lawyer's strategy (where the defendant does not testify) and one based on his own strategy (where the defendant does testify), does not promote fairness, justice, or order, *see Martinez,* 883 F.2d at 761, and preventing this type of situation from arising is clearly a "legitimate interest[ ] in the criminal trial process." *Rock,* 483 U.S. at 55, 107 S.Ct. 2704.

The fact that in the instant case the defendant informed the court that he wanted to testify moments before the verdict was read, rather than moments after, does not make any difference. A new trial would have been necessary just the same. The jury had completed deliberations and reached a verdict. The same "bell" had already been rung, and could not be unrung any more easily just because the verdict had not yet been spoken aloud. Even the attorney appointed to represent Pino at the post-trial hearing regarding Pino's untimely request to testify appeared to concede that a new trial would have been necessary in this case if Pino's request had been granted. Clearly, then, there is nothing to distinguish this case from those cases in which the defendant has been held to waive his right to testify by waiting to speak up until after the jury had delivered its verdict. *See, e.g., Nohara,* 3 F.3d at 1244; *Edwards,* 897 F.2d at 447. Thus, we hold that Pino waived his right to testify by waiting until after the jury had reached a verdict to inform the court that he wanted to testify in his own defense. Whether it became too late for him to assert that right at any earlier point in time is another question for another day.

## B. THE DISTRICT COURT DID NOT PLAINLY ERR IN PERMITTING A GOVERNMENT WITNESS TO TESTIFY THAT PINO'S POST–ARREST STATEMENT "DID NOT MAKE SENSE"

 A district court's evidentiary rulings during trial are reviewed for an abuse of discretion. *United States v. Figueroa–Lopez,* 125 F.3d 1241, 1244 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1823, 140 L.Ed.2d 959 (1998). Specifically, the admission of lay opinion testimony is reviewed for abuse of discretion. *See United States v. VonWillie,* 59 F.3d 922, 929 (9th Cir.1995).

Pino challenges several statements made by Deputy Cotero in his direct testimony, in which Cotero expressed the opinion that Pino's various post-arrest statements "did not make sense." At trial, the defense failed to object to several of these statements, but did object to some of the now-challenged testimony on the grounds that it was speculative. At no time during trial did the defendant ever make the argument that any of Cotero's testimony was improper lay opinion testimony. Nonetheless, on appeal, his sole argument against the admissibility of this testimony is that it was improper lay opinion testimony, admitted in violation of Federal Rule of Evidence 701.

 Clearly, where the testimony was not objected to at all before the district court, we review for plain error. *United States v. Simas,* 937 F.2d 459, 464 (9th Cir.1991). Likewise, since the defense did not raise the improper lay opinion testimony objection at trial, we review for plain error, even as to those statements to which some other objection was made. "[A] party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection ... but also by making the *wrong* specific objection...." *United States v. Gomez–Norena,* 908 F.2d 497, 500 (9th Cir.1990) (citations omitted) (emphasis in original); *United States v. Rivera,* 43 F.3d 1291, 1295 (9th Cir.1995). Thus all of the challenged statements are reviewed for plain error.

 Federal Rule of Evidence 701 "permits a lay witness to give opinion testimony as long as the opinion is '(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" *United States v. Yazzie,* 976 F.2d 1252, 1255 (9th Cir.1992) (quoting Fed.R.Evid. 701). Even assuming that the admission of some or all of Cotero's testimony might have been error under this test, however, it clearly was not "plain error." Plain error is error "that is clear, plain, or obvious." *United States v. Lussier,* 128 F.3d 1312, 1317 (9th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1824, 140 L.Ed.2d 960 (1998). A judgment will not be reversed for plain error unless the appellant can show that "the error affected his 'substantial rights,' that is, '[i]t must have affected the outcome of the District Court proceedings.'" *Id.* (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Here, there was overwhelming evidence of Pino's guilt, and glaring inconsistencies in his own various statements. The jury would surely have doubted the truth of Pino's statements regardless of whether Cotero testified that those statements "did not make sense." Thus it is highly unlikely that the outcome of the district court proceedings would have been different absent Deputy Cotero's comments. Since the admission of this testimony did not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings," *Olano,* 507 U.S. at 732, 113 S.Ct. 1770, we find that the admission of these comments was not plain error.

## C. PINO'S RIGHT TO REMAIN SILENT WAS NOT VIOLATED

 Pino claims that allowing Deputy Cotero to testify to the fact that Pino remained momentarily silent after the deputy recited the events observed by the

Border Patrol pilot infringed on Pino's Fifth Amendment right to remain silent. We review de novo whether references to a defendant's silence violate his Fifth Amendment right to remain silent. *United States v. Ross,* 123 F.3d 1181, 1187 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 733, 139 L.Ed.2d 670 (1998); *United States v. Mende,* 43 F.3d 1298, 1301 (9th Cir.1995).

 The Fifth Amendment guarantees that "[n]o person … shall be compelled in any criminal case to be a witness against himself. …" U.S. Const. amend. V. This privilege is protected by informing criminal suspects that they have "the right to remain silent," pursuant to *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Since a defendant who is given this warning is implicitly being told that no penalty will be imposed against him for choosing to exercise the right to remain silent, the Fourteenth Amendment Due Process Clause has thus been interpreted to prohibit the use of a defendant's post-warning silence for impeachment purposes. *Doyle v. Ohio,* 426 U.S. 610, 618–19, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

 However, the rights guaranteed by *Miranda,* including silence, can clearly be waived. Thus a defendant who voluntarily waives his right to remain silent after being informed of his rights cannot prevent the introduction at trial of statements he makes after he waives that right. *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). Here, there is no question at all that Pino validly waived his rights after he was arrested, and voluntarily responded to Deputy Cotero's questions. Pino does not contend otherwise.

Therefore, since Pino had validly waived his right to remain silent, comment on his silence would only have been impermissible if he had reinvoked his rights, either totally or selectively. *See United States v. Garcia–Cruz,* 978 F.2d 537, 541–42 (9th Cir.1992); *United States v. Lorenzo,* 570 F.2d 294, 297–98 (9th Cir.1978). There is

nothing in the record to indicate that Pino's momentary silence was intended to be a reinvocation of his rights. After waiving his rights and answering numerous questions, Pino was momentarily silent in response to one question before beginning to speak again. He simply paused before he responded. As in *Lorenzo,* Pino's momentary failure to respond to one question asked by the interrogating agent before continuing to speak does not constitute a reinvocation of the right to remain silent. *Lorenzo,* 570 F.2d at 298 (stating that "intermittent silences in response to certain questions by officers did not revoke an earlier waiver of *Miranda* rights …. [where] the officers were courteous and did not exert pressure"). It should be noted that Pino began speaking again without any prompting or further questioning from Cotero. Since Pino had validly waived his right to remain silent, and had not reinvoked that right, comment on his brief silence was not error.

 We note, finally, that the above analysis assumes that the prosecution actually did "comment" on the defendant's silence. In fact, both Deputy Cotero, in his testimony, and the prosecuting attorney, in her summation, simply mentioned the fact that Pino "stood there silent" for a moment before going on to state: "that while he was in the military, he learned the-capable [sic] of what traffickers can do and that we cannot arrest anybody in Mexico and that money in Mexico could buy anything, so what's the use?" It is evident that the prosecution was more concerned with introducing this statement than the silence which preceded it. The silence was mentioned more in passing, in setting the stage for what Pino said next, than as a focus in itself. Likewise, the prosecution never indicated in any way that this silence somehow provided an inference of Pino's guilt. It was simply mentioned, not stressed, and no one ever attempted to draw any meaning from the silence at all. *See United States v. Ochoa–Sanchez,* 676 F.2d 1283, 1287 (9th Cir.1982).

■ Thus even if mention of Pino's silence was error, it was clearly harmless. To determine whether improper comment or testimony regarding a defendant's silence is harmless, three factors are considered: "(1) the extent of the comments made; (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting the defendant's guilt." *United States v. Baker*, 999 F.2d 412, 416 (9th Cir.1993). Since the "comments" were not extensive at all, no inference of guilt from that silence was ever even implied, and there was overwhelming other evidence of Pino's guilt, any possible error was harmless. *Ross*, 123 F.3d at 1188. This was not a close case. The fact that the jury heard that Pino was momentarily silent during his post-arrest interview likely had no impact on its verdict at all.

AFFIRMED.